J-A30034-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TINA TEDESCO | |
| Appellant | No. 1053 EDA 2016 |

Appeal from the Judgment of Sentence entered October 26, 2015
In the Court of Common Pleas of Monroe County
Criminal Division at No: CP-45-CR-0002229-2013

BEFORE:  BOWES, OLSON, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:　　　　　　　**FILED MARCH 20, 2017**

Appellant, Tina Tedesco, appeals from the judgment of sentence imposed on October 26, 2015 in the Court of Common Pleas of Monroe County following her convictions of third degree murder, neglect of care-dependent person, theft by unlawful taking, theft by failing to make required disposition of funds received, and tampering with/fabricating physical evidence.[1]  With the exception of tampering with physical evidence, Appellant also was convicted of conspiracy to commit each of the enumerated crimes.[2]  The trial court sentenced Appellant to an aggregate

---

[1] 18 Pa.C.S.A. §§ 2502(c), 2713(a)(1), 3921(a), 3927(a), and 4910(1).

[2] 18 Pa.C.S.A. § 903.

term of incarceration of not less than 183 (15.25 years) months and not more than 366 months (30.5 years). Appellant filed post-sentence motions that were denied by order of March 3, 2016. This timely appeal followed.[3] Both Appellant and the trial court complied with Pa.R.A.P. 1925. Following review, we affirm.

The trial court issued findings of fact in an opinion accompanying its order denying Appellant's omnibus pre-trial motion. Trial Court Pre-Trial Opinion ("Pre-Trial Opinion"), 6/20/14, at 1-7. The trial court also thoroughly summarized the evidence presented at trial in its opinion disposing of Appellant's post-sentence motion. Trial Court Post-Sentence Opinion ("Post-Sentence Opinion"), 3/3/16, at 1-11. We hereby adopt the findings of fact and summary of trial evidence as our own and incorporate them herein by reference.

Briefly, Appellant and her husband had a relationship with their victim, Barbara Rabins, for approximately twelve years preceding Ms. Rabins' August 18, 2011 death at the age of 70. Ms. Rabins was a mentally and physically disabled individual who was estranged from her out-of-state family and whose father established a trust fund for her before his death.

_____

[3] Appellant was tried, convicted, and sentenced with her husband, John Tedesco. Although their cases were joined for trial, they were convicted of the same crimes, and they received identical sentences, their appeals have not been consolidated. Mr. Tedesco's appeal is docketed at No. 787 EDA 2016.

Appellant and her husband received $2,000 per month from the trust for rent and incidental expenses as well as money from the trust to pay for their utility bills. In addition, Appellant, as payee, received Ms. Rabins' $1,300 monthly social security checks. Also, Appellant and her husband were designated beneficiaries of $100,000 life insurance policy insuring Ms. Rabins and identifying her as their aunt.

In 2010, Ms. Rabins suffered a stroke and was admitted to a rehabilitation facility. The Tedescos insisted that she be released to their care shortly thereafter and Ms. Rabins was discharged against medical advice. At the time of her discharge on July 14, 2010, Ms. Rabins weighed 219 pounds. At the time of her August 2011 death, which was caused by "hypernatremic dehydration with aspiration of food bolus," *i.e.*, dehydration with high sodium levels and choking (on a piece of cheese), Ms. Rabins weighed 116 pounds. An autopsy revealed that, at the time of her death, Ms. Rabins was wearing an adult disposable diaper that was wet with urine, feces and blood. She suffered from pressure ulcers on her chest, thighs, legs, feet, right elbow and forearm, back, lower back, buttocks and hand. Photographs taken at the autopsy showed that her arms and hands were dirty and covered in feces, with feces under her overgrown fingernails that were an inch to an inch and a half long on one hand. Ultimately, the doctor who conducted the autopsy announced that the manner of death was neglect of a care dependent person, fitting the medical definition of

homicide. As a result, the Pennsylvania State Police initiated an investigation into her death, including a search of the Tedescos' home. Appellant and her husband both voluntarily gave statements to the police.

The Tedescos contended that they cared for Ms. Rabins in their home but evidence suggested that she was actually living in an apartment with a roommate, Tom Miller, who was hospitalized in a V.A. hospital beginning in March of 2011 and beyond Ms. Rabins' death. A search of the apartment revealed an apartment in a filthy condition that contained wheelchairs, walkers, and a blanket and couch that were soiled.

The Tedescos were arrested in July 2013 and charged with the crimes of which they were convicted. In this appeal from the judgment of sentence entered by the trial court, Appellant asks us to consider eleven issues, all but one of which were preserved in her Rule 1925(b) statement.

Appellant's issues, which we have reordered for ease of discussion, are as follows:

I.  Whether the trial court erred in admitting the grand jury testimony of [John Tedesco] against [Appellant] at trial in violation of ***Bruton***?[4]

II.  Whether the trial court commited (*sic*) error by failing to dismiss due to prosecutorial delay?

III.  Whether the trial court committed error by denying [Appellant's] motion to sever her trial from her husband John Tedesco's trial?

_____

[4] ***Bruton v. United States***, 391 U.S. 123 (1968).

- 4 -

IV.    Whether the trial court erred in failing to suppress the statements made by [Appellant] to the police where the interrogation lasted several hours and [Appellant] was never advised of her Miranda rights?

V.    Whether the trial court erred in allowing Nurse Blanchard-Doran to testify as an expert, over the objection of counsel for [Appellant], where the Commonwealth failed to provide notice to the defense of this intended use of the witness, no report was prepared and her testimony was not able to be viewed by defense expert (*sic*)?

VI.    Whether the trial court erred in allowing the witness Jillian Viscardi to testify without provideing (*sic*) any notice to the defense that she was a witness or that the attorney for the Commonwealth himself interviewed her so no written statement existed?

VII.    Whether the trial court erred in allowing the cumulative testimony of Corporal [Gross] regarding the condition of the victim's body?

VIII.    Whether the trial court erred in allowing the admission of documents and items into evidence over the objection of counsel for the defense, that had not been provided in discovery in violation of Pa.R.Cr.P. 573?

IX.    Whether the trial court erred in failing to grant [Appellant's] motion for change of venue due to the overwelming (*sic*) amount of negative pre-trial publicity?

X.    Whether the trial court erred and abused its discretion in sentencing [Appellant] in the top end of the standard range of the sentencing guidelines, failing to consider the numerous mititgating (*sic*) factors cited by the defense at the sentencing hearing?

XI.    Whether the trial court erred in failing to grant [Appellant's] motion for judgment of acquittal on the tampering with evidence charge as there was insufficient evidence to convict presented at trial to convict (*sic*)?

Appellant's Brief at 8-10.

In her first issue, Appellant asks us to find trial court error for admitting the grand jury testimony of her husband and co-defendant, John Tedesco, in violation of **Bruton**. However, Appellant did not preserve this issue in her Rule 1925(b) statement. "Any issues not raised in a Pa.R.A.P. 1925(b) statement will be deemed waived." **Commonwealth v. Hill**, 16 A.3d 484, 494 (Pa. 2011) (quoting **Commonwealth v. Lord**, 719 A.2d 306, 309 (Pa. 1998)).[5]

In her second issue, Appellant argues that the trial court erred by not dismissing the case due to prosecutorial delay. Again, Ms. Rabins died in August 2011. Appellant and her husband were charged with the murder of Ms. Rabins in July 2013.

In **Commonwealth v. Wright**, 865 A.2d 894, 901 (Pa. Super. 2004), this Court determined that:

> [T]he standards set out by the Supreme Court in **Commonwealth v. Snyder**, 552 Pa. 44, 713 A.2d 596 (1998), and the subsequent application of those standards in the *en banc* decision of this Court in **Commonwealth v. Snyder**, 761 A.2d 584 (Pa. Super. 2000) (*en banc*), *appeal denied,* 572 Pa. 703, 813 A.2d 841 (2002), are the touchstones upon which we must analyze the claim of appellant.

_____

[5] Even if not waived, Appellant would not prevail on her **Bruton** claim. As the trial court explained in addressing the issue, which was raised in Appellant's post-sentence motion, a reference to Appellant in the testimony was appropriately changed to "the other person" on one occasion, avoiding any **Bruton** violation. Trial Court Opinion, 3/3/16, at 25. A later reference to Appellant was not redacted but no objection was lodged and her husband's response did not implicate Appellant but rather implicated himself as the one who cared for Ms. Rabins.

*Id.* at 901. We explained:

> The Supreme Court in **Snyder** held that pre-arrest delay constitutes a due process violation where there has occurred "actual prejudice to the defendant" and there existed "no proper reasons for postponing the defendant's arrest." **Commonwealth v. Snyder, supra**, 552 Pa. at 62, 713 A.2d at 605. This Court, thereafter, stated that "even in the face of prejudice, delay is excusable if it is *a derivation of reasonable investigation.*" **Commonwealth v. Snyder, supra**, 761 A.2d at 587 (emphasis supplied), *citing* **Commonwealth v. Sneed**, 514 Pa. 597, 526 A.2d 749 (1987). Thus, it is clear that any inquiry into pre-arrest delay must be directed to both the existence of prejudice to the defendant and to the cause of the delay.

*Id.* (footnote omitted). Further,

> Taking our direction from the procedure described in **Snyder***,* we deem it appropriate that in extended pre-arrest delay cases there should be a shifting burden, with the initial burden upon the accused to establish that the pre-arrest delay caused actual prejudice, and the subsequent burden upon the Commonwealth to provide a reasonable basis for the extended delay in prosecuting the crime.

*Id.* at 902.

As the trial court noted, Appellant does not suggest that the statute of limitations had expired for any of the crimes with which she was charged. Pre-Trial Opinion, 6/20/14, at 8. Instead, Appellant argues that she suffered prejudice as a result of the pre-arrest delay because two potential witnesses, Tom Miller and Ronnie Mendel, were not available to testify. However, as the trial court recognized, Mr. Miller was already in the V.A. Hospital at the time of Ms. Rabins' death and could not recall his contacts with Ms. Rabins or Mr. Tedesco at that time. *Id.* at 12. Further, Ms. Mendel, who was Ms.

Rabins' sister, was estranged from her sister and, as the trial court noted, it was not clear how her testimony could have benefitted the defense. *Id.*

As the Commonwealth observes, Ms. Mendel passed away before trial but her husband was available to testify and did testify concerning Ms. Rabins' estrangement from her family. Commonwealth Brief at 21. "Therefore, even if the absence of Ronnie [Mendel] could conceivably be considered as prejudicial to the defense, the presence, availability and testimony of [her husband] adequately covered that issue as demonstrated by the transcript." *Id.*

We agree with the trial court's conclusion that Appellant did not suffer any prejudice as a result of any pre-arrest delay.[6] Appellant is not entitled to relief on this issue.

In her third issue, Appellant contends the trial court erred by denying her request to sever her trial from that of her husband. Appellant acknowledges that "[t]he decision to grant or deny a severance rests in the sound discretion of the trial court." Appellant's Brief at 23. However, she argues that separate trials should have been granted in accordance with

_____

[6] Even if Appellant successfully carried her burden to show prejudice, the Commonwealth provided a reasonable basis for the delay. As the trial court explained, "[T]he Commonwealth had a reasonable basis in continuing to investigate the circumstances of Barbara Rabins' death and that part of the delay after the gathering of Barbara Rabins' medical records was caused by the use of the grand jury to pursue the investigation." Pre-Trial Opinion, 6/20/14, at 12.

Pa.R.Crim.P. 583, which provides that the court may order separate trials if it appears that any party may be prejudiced by the defendants being tried together. She suggests that prejudice existed here in light of the fact she and her co-defendant were also husband and wife. She argues that **Bruton** addresses the issue of one defendant's statements implicating a co-defendant. She also raises the issue of spousal immunity, contending that testimony of either co-defendant is subject to spousal immunity and is inadmissible against the other spouse.

We disagree. First, regarding **Bruton**, there were no statements by John Tedesco that implicated Appellant. **See** n. 5. As to spousal immunity, as the trial court recognized, 42 Pa.C.S.A. § 5913 provides for spousal immunity in a criminal proceeding but with certain exceptions, one of which is a criminal proceeding that includes a murder charge. 42 Pa.C.S.A. § 5913(4). Appellant has not demonstrated any prejudice resulting from the trial court's denial of her motion to sever, and spousal immunity does apply to murder trials. Moreover, as the Commonwealth notes, joint trials are appropriate when the defendants face conspiracy charges as they did here, and when the charges demonstrate a logical connection between the defendants and the crimes charged. Commonwealth Brief at 29 (citing **Commonwealth v. Paolello**, 665 A.2d 439 (Pa. 1995). Finding no abuse of discretion on the part of the trial court for denying the severance request, we conclude that Appellant's third issue fails for lack of merit.

In her fourth issue, Appellant asserts trial court error for denying her motion to suppress the statements she gave to police because the interrogation lasted several hours, she was in custody at the state police barracks, and she was not advised of her *Miranda* rights. The trial court rejected Appellant's characterization of the circumstances surrounding her statements and concluded *Miranda* rights were not required.

Our standard of review of "the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. (Patrick Scott) Jones*, 121 A.3d 524, 526 (Pa. Super. 2015) (quoting *Commonwealth v. (Curtis) Jones*, 988 A.2d 649, 654 (Pa. 2010)). Where the suppression court's findings are supported by the record, we are bound by those findings and may reverse only if the court's legal conclusions are erroneous. *Id.*

Appellant was questioned three times. The first occasion was during the execution of the search warrant of the Tedescos' home. Corporal William Gross of the Pennsylvania State Police "escorted [Appellant and her daughter] to the kitchen area and [Appellant] and her daughter and [Corporal Gross] remained in the kitchen for the entire time the search warrant was being conducted." Pre-Trial Opinion, 6/20/14, at 16 (quoting notes of testimony of the suppression hearing). During the search, the Corporal explained to Appellant that the purpose of the search was to

investigate questions raised by the coroner about Ms. Rabins' death and he asked Appellant about her relationship with Ms. Rabins. *Id.*

The trial court determined that Appellant was not subjected to a custodial investigation necessitating administration of *Miranda* rights. "Specifically excluded from custodial interrogation (in the *Miranda* decision) was '[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process . . . .'" *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 477 (1966)). Because the Corporal's questions "appear to be the general fact-gathering questioning excluded from the *Miranda* holding[,] . . . there was no custodial interrogation in the house of the kind addressed in *Miranda*." *Id.* at 17.

In addition to the questioning in her kitchen, Appellant also was questioned twice at the police barracks. She and her husband voluntarily arrived at the barracks and signed in as visitors in response to a state police request that they come to answer questions. Each was interviewed by two state troopers in separate audiotaped sessions that, for Appellant, lasted approximately 90 minutes. During the session, she voiced on various occasions her understanding that she was not under arrest and was free to leave at any time. Although she was questioned in a closed room, the door was not locked and she was not restrained.

At the conclusion of the interview, Appellant went to the parking lot to wait for her husband. One of the troopers later came out to the parking lot

and asked her to return to the barracks to answer additional questions prompted by responses her husband gave during his interview. Appellant agreed and returned to the barracks for an additional interview that lasted approximately ten minutes. She again acknowledged her understanding that she was free to leave during the questioning.

The trial court, after reviewing the audiotapes of the two interviews, concluded that Appellant was subject to interrogation but it was not a custodial interrogation requiring the administration of *Miranda* warnings. Pre-Trial Opinion, 6/20/14, at 17-18. As the trial court recognized, "The test for determining whether a suspect is in custody is whether the suspect is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonable believes that his freedom of action or movement is restricted." *Id.* at 15 (quoting *Commonwealth v. Eichlinger*, 915 A.2d 1122, 1133-34 (Pa. 2007)). Also, "[a] person is considered to be in custody for purposes of *Miranda* when the officer's show of authority leads the person to believe that she was not free to decline the officer's request, or otherwise terminate the encounter." *Id.* (quoting *Commonwealth v. Page*, 965 A.2d 1212, 1218 (Pa. Super. 2009) (additional citation omitted)). We find the trial court's factual findings are supported by the record and that its legal conclusions are correct. Therefore, we shall not disturb the trial court's ruling denying Appellant's motion to suppress. Appellant's fourth issue fails.

Appellant's fifth through eighth issues allege trial court error relating to evidentiary issues. As such, our standard of review is abuse of discretion. **Commonwealth v. Watson**, 945 A.2d 174, 176 (Pa. Super. 2008); **Commonwealth v. G.D.M., Sr.**, 926 A.2d 984, 986 (Pa. Super 2007).

In her fifth issue, Appellant asserts trial court error for allowing Nurse Blanchard-Doran to testify as an expert witness because the Commonwealth failed to identify her as an expert witness, because no report was prepared, and because Appellant's expert was unable to view her testimony. As this Court recognized in **Watson**, "Our standard of review in cases involving the admission of expert testimony is broad: 'Generally speaking, the admission of expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion." **Watson**, 945 A.2d at 176 (quoting **Commonwealth v. Brown**, 596 A.2d 840, 842 (Pa. Super. 1991) (additional citations omitted)). "An expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice." **Id.** (citing **Brown**, **supra**).

Ms. Blanchard-Doran was the director of nursing at a facility where Appellant's victim was treated a year prior to her death. As mentioned above, Ms. Rabins left the facility against medical advice at the insistence of Appellant and her husband. The witness offered testimony concerning Ms. Rabins' stay at the facility, her condition, and her discharge against medical advice. When the witness offered testimony regarding the staging of

wounds, counsel for Appellant objected based on the lack of an expert report. The trial court permitted the prosecution to voir dire the witness and afforded defense counsel the opportunity to question the witness on her qualifications. The witness was then received as an expert in geriatric nursing.

As the trial court recognized, Pa.R.E. 702 (Testimony by Expert Witnesses) provides that a witness qualified by knowledge, skill, training or education may offer opinion testimony if the expert's knowledge is beyond that of the average layperson, the expert's specialized knowledge will aid the trier of fact to understand the evidence, and the expert's methodology is accepted in the relevant field. "Determining whether a witness may testify as an expert is a matter within the sound discretion of the trial court, whose decision will only be reversed for a clear abuse of discretion." Post-Sentence Opinion, 3/3/16, at 28 (quoting *Yacoub v. Lehigh Valley Medical Associates, P.C.*, 805 A.2d 579, 591 (Pa. Super. 2002)).

The trial court concluded that Ms. Blanchard-Doran had the requisite knowledge and skills to qualify as an expert under Pa.R.E. 702, noting:

> [Ms. Blanchard-Doran's] expertise in geriatric nursing qualified her to discuss pressure ulcers and wounds and her knowledge of them as they relate to geriatric patients. She is not required to be admitted as an expert in pressure ulcers and their staging specifically, as [Appellant] contends in her brief, to be qualified to discuss pressure ulcers in geriatric patients.

*Id.* at 29. Further, the Commonwealth did not violate any disclosure rules because the witness did not generate or introduce an expert report. *Id.*

- 14 -

Moreover, the defense was on notice of the prosecution's intention to offer an expert in pressure ulcers, even if the expectation was that a different witness would offer that testimony. Consequently, Appellant did not suffer any prejudice. Finding no abuse of discretion in the trial court's admission of Ms. Blanchard-Doran's expert testimony, we reject Appellant's fifth issue for lack of merit.

In her sixth issue, Appellant argues that the trial court erred by permitting Jillian Viscardi to testify without notice to the defense of the intent to call her as a witness. Appellant also complains that the prosecutor failed to disclose that he interviewed Ms. Viscardi in the course of his trial preparation and that, as a result, there was no written statement from the witness. Again, our standard of review is abuse of discretion.

When Ms. Viscardi was called to testify, counsel for Appellant asked for an offer of proof. The prosecutor explained that Ms. Viscardi was a high school friend of one of the Tedescos' daughters and would testify about the Tedescos' home and who was living there. Counsel then objected, suggesting that there must have been a statement taken from the witness. The prosecutor explained that Ms. Viscardi was identified by another of the daughter's friends in July 2015 from a photograph and was interviewed by the prosecutor himself in the course of his trial preparation. No statement was prepared. In response to the trial court's question concerning disclosure of the witness, the prosecutor explained that notice of the witness was not

required under the discovery rule. The trial court overruled the objection and permitted the testimony.

"The Rules of Criminal Procedure require only that the Commonwealth disclose the identity of eyewitnesses." ***Commonwealth v. Dietterick***, 631 A.2d 1347, 1351 (Pa. Super. 1993) (citation omitted), *appeal denied*, 645 A.2d 1312 (Pa. 1994). Ms. Viscardi was not an eyewitness to any criminal activity. "The Commonwealth is under no obligation to disclose the names of all its witnesses to the defendant." ***Id.*** (citations omitted). We find no abuse of discretion in the trial court's ruling.

In her seventh issue, Appellant asserts trial court error for permitting Corporal Gross to offer cumulative testimony regarding the condition of Ms. Rabins' body. Appellant contends that testimony concerning the condition of the body had already been offered by Dr. Land and Coroner Cindy Skrzypek, both of whom were present at the autopsy, as well as E.M.T. Mackenzie Joyce who testified as to the condition of the body when Ms. Rabins was pronounced dead. Appellant's Brief at 46-47. She argues that Corporal Gross's testimony was designed to elicit an emotional response from the jury and that the testimony had little probative value but significant prejudicial effect due to the Corporal's status as lead investigator in the case. ***Id.*** at 47-48.

The trial court explained its decision to allow the testimony, noting:

> The testimony of Corporal Gross about the state of Ms. Rabins['] body as he observed it at the autopsy was limited. He testified

- 16 -

that Ms. Rabins was dressed in a t-shirt and adult diaper with feces and urine in it. He did not testify further as to the state of her body. Although testimony regarding the state of Ms. Rabins' body was previously elicited, albeit in a much more graphic fashion, Corporal Gross' testimony regarding his observations at the autopsy was necessary to explain why he then initiated the investigation into Ms. Rabins['] death. The probative value of this very limited testimony was not outweighed by needlessly presenting cumulative evidence. Further [Appellant] has failed to show how Corporal Gross' limited testimony about the state of Ms. Rabins' body prejudiced her.

Post-Sentence Opinion, 3/3/16, at 40. We find no abuse of discretion on the part of the trial court for permitting the Corporal to provide limited testimony concerning his observations and the role his observations played in the initiation his investigation into Ms. Rabins' death. Appellant's seventh issue does not afford any basis for relief.

In her eighth issue, Appellant argues that the trial court erred in allowing the admission of documents and items into evidence that had not been provided in discovery. Appellant contends that several pieces of evidence were admitted over her counsel's objection despite the fact the Commonwealth had not disclosed the existence of the items. She claims her counsel could not have discovered the evidence through the exercise of due diligence. Appellant's Brief at 49. Appellant suggests that the amount of evidence not disclosed was not a coincidence but rather reflected that the Commonwealth attempted to ambush Appellant at trial. *Id.*

As the trial court recognized, Pa.R.Crim.P. 573 (Pretrial Discovery and Inspection) "enumerates items that must be disclosed upon the defendant's

request if they are material to the case, and provides that when applicable, the Commonwealth shall 'permit the defendant's attorney to inspect and copy or photograph such items.'" Post-Sentence Opinion, 3/3/16, at 30 (quoting Pa.R.Crim.P. 573(B)(1)). Items to be disclosed include "any tangible objects, including documents, photographs, fingerprints, or other tangible evidence." Pa.R.Crim.P. 573(B)(1)(f).

The joint trials of Appellant and her husband began on August 5, 2015, and concluded on August 14, 2015. During the August 7 proceedings, in response to objections that copies of the items comprising Exhibits 37 and 39 were not provided to the defense, the prosecution argued that Commonwealth property records disclosed to Appellant and her husband revealed that there were "miscellaneous documents" in the Commonwealth's possession. Counsel for John Tedesco argued there was an assumption the Commonwealth would copy and provide all such documents. The trial court determined the defense was aware of the documents and that those documents were available for inspection. Consequently, the trial court ruled that the Commonwealth could introduce Exhibits 37 and 39. Defense counsel could then review the documents to determine whether there were any evidentiary objections to the documents before the trial court would admit them. Defense counsel agreed to that proposed process.

At the conclusion of the day's proceedings, the trial court dismissed the jury and then discussed the challenged documents with counsel.

Counsel for John Tedesco advised the trial court that he did not have a problem with the documents other than the way they were listed for discovery. He indicated he had no evidentiary objections to any of the documents. Notes of Testimony, 8/7/15, at 237. Appellant's counsel then stated, "I agree." **Id.** The trial court admitted the documents. **Id.** at 238. Appellant's counsel did not lodge an objection. Therefore, the issue was not preserved for appeal. Even if the issue were preserved, we would find no abuse of discretion on the part of the trial court. As the trial court explained, "Rule 573 was not violated as the Commonwealth provided a complete list of the documents and items in their possession to the defense and offered them for inspection and copying." Post-Sentence Opinion, 3/3/16, at 34. Because the Commonwealth complied with Rule 573, the trial court did not abuse its discretion by admitting the evidence. We shall not disturb that ruling. **See Commonwealth v. Antidormi**, 84 A.3d 736, 749 (Pa. Super. 2014) (decision to admit evidence "shall be reversed only upon a showing that the trial court abused its discretion in determining whether evidence should be admitted") (citation omitted).

Appellant also complains that the trial court admitted documents from Ms. Rabins' trust administrator. However, as the trial court explained:

> The trust documents were documents that . . . the administrator of the trust[] had brought with her and given to the Commonwealth upon her arrival. They were not in the possession of the Commonwealth to give to the defense during pre-trial discovery and were turned over to the defense as soon as they were in the Commonwealth's possession. [Counsel] for

the Commonwealth stated that "[a]t the earliest opportunity I put both on counsel table prior to 8:30 this morning. As soon as I saw both counsel, I explained what it was and when I got it."

Post-Sentence Opinion, 3/3/16, at 34 (references to notes of testimony omitted). "The Commonwealth 'does not violate discovery rules where it does not provide defendant with evidence that it does not possess and of which it is unaware during pretrial discovery.'" *Id.* at 34-35 (quoting *Commonwealth v. Flood*, 627 A.2d 1193, 1200-01 (Pa. Super. 1993)).

We find no abuse of discretion on the part of the trial court with respect to the "miscellaneous documents" that were admitted. Likewise, we find no abuse of discretion for admitting documents provided by the trust administrator that were given to Appellant's counsel as soon as practicable. Appellant's eighth issue fails for lack of merit.

In her ninth issue, Appellant argues trial court error for denying her motion for a change of venue based on overwhelming negative pre-trial publicity. Our Supreme Court has explained:

> A trial court's decision on a defendant's motion for a change of trial venue based on the claimed existence of pretrial publicity prejudicial to his or her right to trial before an impartial jury is one vested within its sound discretion, and a trial court's decision to deny such a motion will not be overturned by this Court on appeal, unless the record evidences that the trial court has abused its discretion in making its ruling. *Commonwealth v. Weiss*, 565 Pa. 504, 514, 776 A.2d 958, 964 (2001). We have recognized that "the trial court is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change." *Commonwealth v. Tharp*, 574 Pa. 202, 219, 830 A.2d 519, 529 (2003). In reviewing the trial court decision not to grant a change of venue the focus of our inquiry is to determine whether any juror formed a fixed opinion

of the defendant's guilt or innocence due to the pretrial publicity. ***Commonwealth v. Drumheller***, 570 Pa. 117, 132, 808 A.2d 893, 902 (2002).

A change in venue is compelled whenever a trial court concludes a fair and impartial jury cannot be selected from the residents of the county where the crime occurred. ***Weiss***, at 514–15, 776 A.2d at 964. As a general rule, for a defendant to be entitled to a change of venue because of pretrial publicity, he or she must show that the publicity caused actual prejudice by preventing the empanelling of an impartial jury. ***Commonwealth v. Robinson***, 581 Pa. 154, 195, 864 A.2d 460, 484 (2004). The mere existence of pretrial publicity alone, however, does not constitute actual prejudice. Simply because prospective jurors may have heard about a case through media reports does not render them incapable of jury service, since, in today's "information age," where news of community events are disseminated virtually instantaneously by an ever multiplying array of delivery methods, it would be difficult to find 12 jurors who do not at least have some knowledge of the facts of an important and tragic incident like this one.

***Commonwealth v. Briggs***, 12 A.3d 291, 313 (Pa. 2011) (citations omitted).

Appellant's request for a change of venue was a component of her omnibus pre-trial motion argued on February 27, 2014. The trial court denied the motion, noting that media coverage documented by Appellant was, for the most part, coverage at the time of Appellant's arrest in July 2013 or her preliminary hearing in September 2013. Only one newspaper article—published on February 4, 2014 when the case was listed for trial—post-dated the preliminary hearing. "[A] change of venue will not be required where there has been sufficient time between publication and trial

- 21 -

for the prejudice to dissipate." Pre-Trial Opinion, 6/20/14, at 13 (citations omitted).

As the trial court explained, significant time had elapsed since the coverage took place. Although the trial court denied the request for a change of venue, the court indicated that Appellant would "be given the opportunity of individual voir dire at the time of jury selection. A determination can be made at that time whether it is possible to obtain an impartial jury. The motion will be denied, with the right to renew the motion if necessary during jury selection." Pre-Trial Opinion, 6/20/14, at 14.

Although the trial testimony was transcribed, there is no transcription of the notes of testimony from jury selection. Appellant does not suggest that she renewed her motion during jury selection. The Commonwealth indicates:

> The issue did not appear to come up in any meaningful way during jury selection. Certainly counsel for the Appellant would have possessed unlimited challenges for cause. If the jury pool was tainted by a mass of adverse or negative pretrial publicity one would expect there to be a record made of the same. However, there is no such record. There is no basis in the record to grant the relief requested by Appellant.

Commonwealth Brief at 54-55. We agree. Appellant's change of venue challenge fails.

In her tenth issue, Appellant contends the trial court erred and abused its discretion by sentencing her at the upper end of the standard range of the sentencing guidelines and failed to consider mitigating factors raised by

Appellant at the sentencing hearing. As such, Appellant presents a challenge to the discretionary aspects of sentencing and her brief must include a concise statement of the reasons relied upon for allowance of appeal in accordance with Pa.R.A.P. 2119(f). However, Appellant instead includes a statement of the scope and standard of review for a challenge to discretionary aspects of sentencing and refers to Pa.R.A.P. 3518, a rule rescinded in 1999. Appellant's Brief at 2. She proceeds to note that a sentence will not be reversed absent an abuse of discretion; that to constitute an abuse of discretion, a sentence must either exceed statutory limits or be manifestly excessive; that an appellant must raise a substantial question as to the appropriateness of the sentence; and that an appellant must demonstrate that the trial court's actions are inconsistent with the sentencing code or contrary to fundamental norms. *Id.* (citations omitted). However, Appellant's statement does not even suggest a question, let alone a substantial question. Therefore, Appellant has not complied with Rule 2119(f) and has not provided any basis for this Court to entertain a challenge to the discretionary aspects of her sentence. However, the Commonwealth did not object to Appellant's misstep. Therefore, we will not find the issue waived. *See Commonwealth v. Krum*, 533 A.2d 134, 138-39 (Pa. Super. 1987) (*en banc*) (an appellant's failure to comply with Rule 2119(f) may be waived if the Commonwealth fails to object to the defect).

Despite surviving waiver, Appellant's issue nevertheless fails. As this Court has recognized, "[T]he appellant must raise a substantial question as to the appropriateness of the sentence, which would permit us to accept the appeal as to this issue." *Commonwealth v. Kimbrough*, 872 A.2d 1244, 1262 (Pa. Super. 2005) (citation omitted). "Whether a substantial question has been raised that a sentence is inappropriate under the Sentencing Code must be evaluated on a case-by-case basis." *Id.* at 1263 (citation omitted). As this Court reiterated in *Kimbrough*, "A substantial question exists where the brief sets forth a colorable argument that the sentence violates a particular provision of the Sentencing Code or is contrary to the fundamental norms underlying the sentencing scheme." *Id.* (citation omitted).

Appellant contends her sentence was at the upper end of the standard range. However, "[w]hen the sentence is within the range prescribed by statute, a challenge to the maximum sentence imposed does not set forth a substantial question as to the appropriateness of the sentence under the guidelines." *Id.* (quoting *Commonwealth v. Brown*, 587 A.2d 4, 6 (Pa. Super. 1991)). Appellant has failed to present a substantial question for review.

With respect to Appellant's assertion that the trial court did not consider mitigating factors, we note that when the sentencing court has the benefit of a pre-sentence report, "it shall be presumed that that sentencing judge was aware of the relevant information regarding the defendant's

character and weighed those considerations along with the mitigating statutory factors." Post-Sentence Opinion, 3/3/16 at 22 (quoting ***Commonwealth v. Bruner***, 564 A.2d 1277, 1289 (Pa. Super. 1989) (additional citation omitted)). Here, the trial court acknowledged receipt and review of the pre-sentence investigation during Appellant's sentencing. ***Id.*** (citing Notes of Testimony, Sentencing, 10/26/15, at 2). As the trial court explained:

> [T]he sentence for Murder in the Third Degree is within the guideline range and is therefore presumptively reasonable. In sentencing [Appellant], the [c]ourt review[ed] the PSI, letters from the victim's family, letters from [Appellant's] family and friends, and fashioned an aggregate sentence based on the evidence presented at trial and the jury's ultimate finding of guilt as to all charges. Because of the torture and abuse suffered by the Victim, who was mentally handicapped, at the hands of [Appellant and her husband] for their own gain, the consecutive sentences did not result in an excessive aggregate sentence.

***Id.*** We agree. Finding no abuse of discretion on the part of the trial court, Appellant's challenge to her sentence fails.

In her eleventh and final issue, Appellant challenges the sufficiency of the evidence supporting her conviction for tampering with evidence. A challenge to sufficiency of evidence presents a question of law subject to plenary review. ***Commonwealth v. Jones***, 904 A.2d 24 (Pa. Super. 2006) (citation omitted). As this Court noted in ***Jones***:

> In reviewing a sufficiency challenge, we must determine whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict[-]winner, are sufficient to establish all elements of the offense beyond a reasonable doubt.

> To establish the offense of tampering with evidence, the Commonwealth must prove three interrelated elements: (1) the defendant knew that an official proceeding or investigation was pending; (2) the defendant altered, destroyed, concealed, or removed an item; and (3) the defendant did so with the intent to impair the verity or availability of the item to the proceeding or investigation. **Commonwealth v. Morales**, 447 Pa. Super. 491, 669 A.2d 1003, 1005 (1996) (citing 18 Pa.C.S.A. § 4910(1)).

*Id.* at 26 (quotations, citations and footnote omitted).

The trial court concluded that, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, "the accumulation of circumstantial evidence in this case was strong enough for a jury to find that Ms. Rabins did not live or die at the Tedesco home and to make the inference that the Tedescos tampered with physical evidence believing an investigation was forthcoming." Post-Sentence Opinion, 3/3/16, at 14. The trial court proceeded to summarize the evidence supporting the tampering conviction. *Id.* at 14-16. That evidence included a lease reflecting that Ms. Rabins lived in an apartment with Tom Miller; that emergency personnel were called to the apartment to assist Ms. Rabins on several occasions; that the landlord indicated Ms. Rabins lived there; that mail postmarked to Ms. Rabins was found in the apartment; and that the coroner and emergency personnel responding to the Tedescos' home found the immaculate state of the Tedescos' living room incompatible with the Tedescos' statements that Ms. Rabins primarily lived in the living room and died there. In addition, witnesses testified that they never saw Ms. Rabins or any medical equipment

in the Tedesco home and never heard prior to the night Ms. Rabins died that an elderly woman was living there.

> The accumulation of this evidence was such that a jury could find beyond a reasonable doubt that Ms. Rabins was living at the apartment on Route 115 and not the Tedesco home, and that the Tedescos tampered with physical evidence regarding her residence and place of death, believing an investigation into her death was about to be begin.

*Id.* at 16. We agree. Viewing the evidence and reasonable inferences therefrom in a light most favorable to the Commonwealth, we find the evidence was sufficient to support Appellant's conviction of tampering with evidence. Appellant's sufficiency challenge fails.

Judgment of sentence affirmed. In the event of further proceedings, to the extent necessary for review, the parties shall attach to their filings copies of the trial court's June 20, 2014 Pre-Trial Opinion and/or its March 3, 2016 Post-Sentence Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/20/2017

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FOURTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA, :    NO. 2229 CR 2013

              :

    vs.             :

              :

TINA TEDESCO,         :

              :

    Defendant      :

## OPINION

This matter comes before the Court on Defendant Tina Tedesco's Post-Sentence Motion filed November 4, 2015, following a jury trial that took place from August 5, 2015 to August 14, 2015 and sentencing that occurred on October 26, 2015. Ms. Tedesco was charged with and found guilty of Murder in the Third Degree, Criminal Conspiracy to commit Murder in the Third Degree, Theft by Unlawful Taking, Theft by Failure to Make Required Disposition of Funds, Criminal Conspiracy to commit Theft by Unlawful Taking, Criminal Conspiracy to commit Theft by Failure to Make Required Disposition of Funds, Criminal Conspiracy to commit Neglect of a Care Dependent Person, Neglect of a Care Dependent Person, and Tampering with Physical Evidence. Ms. Tedesco was sentenced on October 26, 2015 to an aggregate period of incarceration of not less than 183 months (15.25 years) to 366 months (30.5 years).

Ms. Tedesco filed a post-sentence motion on November 5, 2015, and an amended post-sentence motion on January 19, 2016. The Commonwealth filed a brief in opposition to Defendant's post-sentence motions on January 28, 2016. Ms.

1



Tedesco's post-sentence motions seek a new trial, or in the alternative, to obtain the dismissal of the Tampering with Evidence charge based upon the following contentions:

(1) The Commonwealth failed to present sufficient evidence at trial to convict the defendant of Tampering with Evidence;

(2) The trial court erred and abused its discretion in sentencing Ms. Tedesco to a sentence at the top end of the standard range while failing to consider mitigating circumstances;

(3) The trial court erred in admitting grand jury testimony of a co-defendant in violation of *Bruton;*

(4) The trial court erred by permitting Nurse Blanchard-Doran to testify as an expert in wound care and pressure ulcers;

(5) The trial court erred in allowing the Commonwealth to present at trial various items and records which were not given to the defense before trial in violation of Pa.R.Crim.P. 573;

(6) The trial court committed error by permitting Jillian Viscardi to testify as a witness for the Commonwealth despite the Commonwealth's failure to provide discovery regarding her testimony;

(7) The trial court erred by permitting Corporal Gross to provide cumulative and prejudicial testimony regarding the condition of the victim's body at the time of the autopsy.

2

## DISCUSSION

The evidence presented to support the jury's verdict may be summarized as follows. On August 18, 2011, at 2:54 a.m. paramedics and the Pennsylvania State Police were called to the residence of John and Tina Tedesco at 102 Corine Way, Saylorsburg, Ross Township, Monroe County, Pennsylvania. Call logs from the Monroe County 911 Center stated that the caller arrived home to find Ms. Rabins not breathing and that he was unaware how long she had been not breathing. N.T. 8/5/15 p.119. Upon arrival, responders found seventy (70) year old Barbara Rabins dead. First responders requested the coroner to come to the scene. *Id.* at 120. Cindy Skrzypek, Monroe County Deputy Coroner[1], arrived at the scene, performed an initial review of Ms. Rabins' body at the Tedesco home, and immediately noticed "that it was very, very dirty, very unkempt." N.T. 8/6/15 p.30. She further testified that Ms. Rabins' body had multiple ulcers, that there was possibly feces on her face, and that her body showed a general lack of care. *Id.* at 30-31. She then transported Ms. Rabins to the morgue in Pocono Medical Center. Once she was able to get a better look at the state of Ms. Rabins' body, she found that "[s]he was skin and bones. She was totally filthy, feces on her face, feces stuck underneath her fingernails, multiple ulcers. She had socks on her legs, and it was actually oozing through the socks on the legs, the blood and the seepage, from the lack of care of her legs." *Id.* at 32.

Ms. Skrzypek requested Ms. Rabins' medical records from Pocono Medical Center and received her medical history as well as several discharge summaries. As a

---

[1] At the time of trial, Deputy Coroner Skrzypek was the Chief Deputy Coroner.

3

result of the observations she made at the Tedesco home, speaking with the Tedesco's, her review of Ms. Rabins' body in the morgue, and her review of Ms. Rabins' medical records, Deputy Coroner Skrzypek contacted the police and ordered an autopsy of Ms. Rabins' body.

The autopsy of Ms. Rabins was conducted by Dr. Land on August 19, 2011. Dr. Land's assistant, Michael Gery, Deputy Coroner Skrzypek and Corporal Gross of the Pennsylvania State Police were also present. N.T. 8/5/15 p.166-67. Several photographs taken of Ms. Rabins' body at the time of the autopsy were entered into evidence. Dr. Land identified the cause of death as "hypernatremic dehydration with aspiration of food bolus," or in lay terms, "there was too much salt in her blood… and she inhaled a piece of food that blocked her airway and caused her to suffocate." *Id.* at 173-74. Ms. Rabins was found to be someone who had a history of trouble swallowing because of her stroke and had "a massive [piece of] food stuck blocking the back of her throat in her voice box." *Id.* at 175. Ms. Rabins' face had dirt caked in her eyebrows, her nose, inside and around her eyes, and going down her face. *Id.* at 176. She also had fecal matter on her chest, her abdomen, inside her right hand, and on her arm and shoulders. *Id.* at 185.

Ms. Rabin weighed 116 pounds, having lost close to 90 pounds in the year before she died. *Id.* at 187. There was extensive testimony, coupled with photographs, of pressure ulcers on Ms. Rabins' body, indicating that "she had not been moved for quite some time." *Id.* at 189. Ms. Rabins had a very large pressure ulcer on her lower back that had dead tissue that was "melting away" and "eating into the bone." *Id.* at 190.

4

Her right hand was contracted together and up against her chest with dirt, dead skin, and fecal matter stuck inside it with an inch to an inch and a half long fingernails. *Id.* at 191. Pressure injuries were found on her hand from her fingernails being pressed against the skin, on her chest from her hand, wrist, and arm being pressed against it for a long period of time, on the ball of her foot, and on her right hip and leg. *Id.* at 196-202. Her legs showed signs of edema, or swelling of the legs, where the skin of her lower legs was dying and sloughing off. *Id.* at 204. Ms. Rabins' elbow bone was also exposed, surrounded by dead tissue and skin. *Id.* at 207. Evidence of Alzheimers disease was also found upon examination of Ms. Rabins' brain. *Id.* at 192-93. Finally, Dr. Land testified that he found the manner of death to be neglect of a care dependent person, fitting the medical definition of homicide. *Id.* at 211. As a result of this finding, the Pennsylvania State Police initiated an investigation into the death of Ms. Rabins and the Tedescos.

Several members of the Pennsylvania State Police testified about their investigation into the death of Ms. Rabins. Corporal William Gross, a supervisor with the Pennsylvania State Police Criminal Investigation Unit out of Lehigton, testified as to his presence at the autopsy and the investigation that followed. N.T. 8/7/15 p. 210-36. The Pennsylvania State Police executed a search warrant and conducted a search of the Tedesco home on August 24, 2011. Tina Tedesco was at home and John Tedesco arrived at the home as the police officers were concluding their search. At the conclusion of their search, officers asked the Tedescos to come to the state police barracks to speak with them about the Tedescos' care of Ms. Rabins and the

5

circumstances surrounding her death. The facts and circumstances surrounding these interviews, as raised by the Tedescos' omnibus pretrial motions, were argued and briefed by the parties and addressed by the court following a suppression hearing. *Opinion*, June 20, 2014. All issues raised by the parties, including the suppression of their statements to the police and the issuance of the search warrant lacking probable cause, were discussed and denied. *Id.* at 18. As a result, the statements the Tedescos made to the police on August 24, 2011 were admitted at trial. The Tedescos were arrested on July 9, 2013.

The Commonwealth presented several witnesses at trial who addressed Ms. Rabins' condition and her lack of care throughout 2010, the year before her death. Lorraine Jakubowitz, a physical therapist with the Visiting Nurse Association (VNA), testified that in July 2010 she observed Ms. Rabins in an apartment on Old Route 115 in Saylorsburg when Ms. Jakubowitz was there to provide physical therapy to Thomas Miller. N.T. 8/6/15 p.162-69. Ms. Rabins was found in the bedroom of the apartment lying on a box spring and mattress in her own feces and soaked in urine. *Id.* at 168. Ms. Jakubowitz also testified that on Thomas Miller's admission consent form for the VNA, he said he lived with a female roommate. *Id.* at 173.

Sharon Miller, a care manager for the Monroe County Area Agency on Aging, testified that the Agency got an emergency referral July 14, 2010 from the VNA. *Id.* at 196. The day before the Agency on Aging got the call from the VNA, they also received a referral for Ms. Rabins from Forest Manor Health Care Center, the facility she was cared for in July 2010. *Id.* 137-38. Forest Manor was also concerned about Ms. Rabins

6

care and reported that she was being taken out of the facility against medical advice. *Id.* Both of these referrals resulted in Ms. Miller and Brenda Staples making a home visit to Ms. Rabins at the apartment on Old Route 115 on July 14, 2010. *Id.* at 197. During their home visit, Ms. Miller and Ms. Staples found Ms. Rabins lying on a mattress in her own urine and feces with no adult brief on and none in the apartment to put on her. *Id.* They contacted Mr. Tedesco who initially said he could not come to the apartment to meet them that day but then agreed to come at the urging of Ms. Staples. *Id.* at 200. Ms. Miller and Ms. Staples concluded that it was not safe for Ms. Rabins to be at the apartment and called an ambulance to take her to the hospital. *Id.* at 202. Ms. Rabins had been out of Forest Manor and back at the apartment on Route 115 for approximately 6 hours before she was again admitted to the hospital. N.T. 8/12/15 p.183. Ms. Miller also testified that her reports indicated that Mr. Tedesco said Ms. Rabins had been living with his family until her recent stroke, and that he took her to Mr. Miller's apartment because he had no way to get her up the stairs at his home. N.T. 8/6/15 p.205-06. Her records also indicated that Ms. Rabins was taken out of the Forest Manor nursing home against medical advice. *Id.* at 207. Ms. Miller was then told by Mr. Tedesco that he made a mistake taking her out of the nursing home and that she would be returning to Somerset Valley Nursing Facility after she was released from the hospital. *Id.* at 216. The Area Agency on Aging closed the Barbara Rabins case due to John Tedesco reporting to Ms. Miller and Ms. Staples that she would be returning to an inpatient nursing facility. *Id.*

Dr. Antolin, a psychiatrist at Pocono Medical Center testified that after her examination of Ms. Rabin on July 16, 2010, she felt that Ms. Rabins had depression, mild mental retardation, an inability to take care of her numerous physical ailments, and an inability to make decisions regarding her well-being. *Id.* at 250.

Nurse Sherri Blanchard-Doran, the Director of Nursing at Forest Manor, testified at length regarding Ms. Rabins stay there in July 2010. While in Forest Manor Ms. Rabins was placed on a special pureed diet because "she was unable to masticate and swallow effectively without it going into her lungs." N.T. 8/7/15 p.12. Upon learning that Mr. Tedesco wanted Ms. Rabins to be discharged against medical advice, Nurse Blanchard-Doran attempted to dissuade him from doing so. *Id.* at 16. She informed him of the risk of taking her home too soon, including the risk that Ms. Rabins would likely choke if she was not on a strict diet of "nectar thick liquids." *Id.* at 18.

The Commonwealth presented several documents and witnesses regarding the Tedescos' receipt and control of money from Ms. Rabins' trust, set up by her late father, as well as her social security disbursements. The Tedescos were not using monies received for the care of Ms. Rabins for her benefit. For the 2010 calendar year, 48.5 percent of the household expenses paid for the Tedesco home were paid for by Ms. Rabins. A total of $54,694.75 was deposited in the Wells Fargo bank account which the Tedescos held jointly with Barbara Rabins. These funds were derived from Ms. Rabins' trust and social security disbursements in 2010. N.T. 8/13/15 p.132. This amount received included $1,100 sent from Ms. Rabins' trust for vacations, including the trip to

Wildwood that Ms. Jillian Viscardi testified about that Ms. Rabins did not go on. *Id.* at 134 (Testimony of Jillian Viscardi).

Wendy Serfass a county detective with the Monroe County District Attorney's Office, presented an excel spreadsheet detailing all of the monies received and bills paid by Ms. Rabins from 2006 to the time of her death. *Id.* at 104. The total money received by the Tedescos in this time period was just under $302,000. *Id.* at 105. This included the direct deposit of Ms. Rabins' social security money of $1,375 a month into the joint bank account of the Tedescos and Ms. Rabins. *Id.* at 107. The Tedescos also received money from the trust for "care service" and "cleaning services" relating to Ms. Rabins. *Id.* at 108. Additionally, during the search of the Tedesco home, police officers found a State Farm Life Insurance Policy on a dresser in the master bedroom insuring Ms. Rabins' life for $100,000 and naming Mr. and Ms. Tedesco the beneficiaries, identifying them as niece and nephew. *Id.* at 124. John Tedesco also had a joint bank account with Tom Miller that received his VA and social security benefit monies. *Id.* at 133-34.

Sharon Leinwand, the administrator of Ms. Rabins' trust testified about the process through which the Tedescos or Ms. Rabins would request money from the trust and what she believed the money was being used for. N.T. 8/10/15 p. 48. Ms. Leinwand approved a living room set and bedroom set to be purchased for Ms. Rabins, among other things, as well as all of the utilities to be paid in full, under the impression that Ms. Rabins was living in a "mother-in-law" suite with several rooms in a home, or a two bedroom apartment type of space. *Id.* at 67-75. The trust also paid Ms. Tedesco, who

9

purportedly advanced Ms. Rabins the money, for a vacation to Great Wolf Lodge and a puppy. *Id.* at 82. Ms. Leinwand was under the impression that Ms. Rabins was going on the vacation with friends, and was unaware that the Tedescos had children. The trust also paid for a vacation to Wildwood, New Jersey, among other things, under the impression that Ms. Rabins was requesting the monies herself, when they received typed letters from her with her signature requesting a check be sent. *Id.* at 89. The trust received a request signed by Ms. Rabins for money for this vacation to Wildwood dated June 28, 2012. On that date Ms. Rabins was a patient at Pocono Medical Center. Ms. Leinwand testified that had the trust known that Ms. Rabins was hospitalized as of that date, the trust would not have authorized payment and would have inquired further into the request. *Id.* at 90. She also believed that Ms. Rabins' stay in the rehabilitation center would be fully covered by insurance, as indicated by Ms. Tedesco, but testified that if it was not fully covered, the trust would have certainly paid the remainder of the cost for her to stay if it was requested. *Id.* at 96. The trust would have also approved the payment of $321.92 per day for Ms. Rabins to stay in the Somerset Valley nursing facility, but before they were asked to authorize the payment, Ms. Tedesco informed Ms. Leinwand that Ms. Rabins was released and apparently was "getting along pretty well." *Id.* at 99.

The defense presented the testimony of Dr. Manion who disagreed with the findings of Dr. Land and found that Ms. Rabins was not dehydrated or emaciated at the time of her death. N.T. 8/12/15 p. 24. Dr. Manion testified that Ms. Rabins had "terrible heart disease and vascular disease" that in large part contributed to the formation of her

10

pressure ulcers. *Id.* at 34-35. He opined that Ms. Rabins' ulcers were likely caused by her desire "to stay in bed as much as she can" because of her paranoia and resistance to moving resulting from the fall she suffered after her stroke. *Id.* at 47. He also discussed the dried feces on Ms. Rabins and found it to be normal that the bowel movement she had upon death had become dried and crusted against her skin by the time the autopsy was performed the next day. *Id.* at 52. Finally, Dr. Manion stated her cause of death was accidental due to aspiration of cheese, and not due to her wounds, dehydration, malnutrition or lack of care. *Id.* at 50.

## I.     SUFFICIENT EVIDENCE FOR TAMPERING WITH EVIDENCE CHARGE[2]

### a) Sufficiency of the Evidence

A claim challenging the sufficiency of the evidence presents a question of law. *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa.2000). The court must determine "whether the evidence is sufficient to prove every element of the crime beyond a reasonable doubt." *Commonwealth v. Hughes*, 555 A.2d 1264, 1267 (Pa.1989). The Court "must view evidence in the light most favorable to the Commonwealth as the verdict winner, and accept as true all evidence and all reasonable inferences therefrom upon which, if believed, the fact finder properly could have based its verdict." *Id.* Our Supreme Court has instructed:

---

[2] The Defendant's Post Sentence Motions filed on November 4, 2015 claim that the verdict was "against the weight of the evidence." However, the motion states the standard for reviewing the sufficiency of the evidence. *Post Sentence Motion of Tina Tedesco*, 1/4/2015 ¶5. Additionally, the Defendant's Brief in Support of Defendant's Post-Sentence Motions, briefs the issue of sufficiency of the evidence. The Defendant did not brief the weight of the evidence issue raised in their motion.

11

[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Ratsamy*, 934 A.2d 1233, 1236 n. 2 (Pa. 2007).

Further, "[t]his standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. . . Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." *Commonwealth v. Brunson*, 938 A.2d 1057, 1058 (Pa. Super. 2007).

Ms. Tedesco was charged and found guilty of Tampering with or Fabricating Physical Evidence. The applicable section of the Statute reads as follows:

A person commits a misdemeanor of the second degree if, believing that an official proceeding or investigation is pending or about to be instituted, he:

(1) alters, destroys, conceals or removes any record, document or thing with intent to impair its verity or availability in such proceeding or investigation

18 Pa.C.S.A. § 4910(1). The limiting factor is the requirement of specific intent. *Commonwealth v. Govens*, 632 A.2d 1316, 1328 (Pa. Super. 1993). "The statute punishes any kind of tampering with any document or thing, but only if the defendant acts 'with purpose to impair its veracity or availability' in an official proceeding or

12

investigation." *Id.* The trier of fact need only reasonably infer from the defendant's actions that they were acting with this purpose. *Id.*

In the instant case, the Information charged by the police grounded the Tampering with Evidence charge on the following facts:

> On or about August 17 to 18, 2011 in the County of Monroe, Ross Township, Pennsylvania, Tina Tedesco believing that an official proceeding or investigation was pending or about to be instituted, altered, destroyed, concealed or removed a record, documents or thing with the intent to impair its veracity or availability in such proceeding or investigation, to wit: the defendant alone or with John Tedesco did make it appear that the victim died at defendant's residence in Ross Township in the defendant's living room and that the victim at the time of her death residing with the defendant.

*Criminal Information, Commw. v. Tina Tedesco*, October 10, 2013. During the trial, evidence was presented by several witnesses that supported the facts alleged in the Information. The Commonwealth presented evidence that Ms. Rabins was living at an apartment on Old Route 115 in Saylorsburg with Mr. Miller before he was hospitalized, and died there, not the Tedesco residence. The Tedescos assert that Ms. Rabins died in their home and at the time was living with them in their home. The jury was charged with the following instruction regarding the elements of the crime of Tampering with Physical Evidence:

> "To find one or both of the Defendant's guilty of this offense, you must find that the following elements have been proven beyond a reasonable doubt: First, that the Defendant believed that an official proceeding or investigation concerning the death of Barbara Rabins was about to be instituted. Second, that the Defendant presented a false description of Barbara Rabins's last residence, moving Barbara Rabins's body to their home at 102 Corine Way, and telling investigators that Barbara Rabins was living with them, when in fact at the time of her death she was residing in an apartment on Route 115 in Saylorsburg. Third, that the Defendant knew that Barbara Rabins was not residing at 102 Corine Way and did not die there. And fourth, that the Defendant did so with the intent to mislead

13

ambulance personnel, coroner's office, police, and other public servants who might be engaged in the investigation of Barbara Rabins death."

N.T. 8/14/15 p.163-64. The jury found Ms. Tedesco guilty of Tampering with Evidence, finding the Commonwealth met their burden of proof as to all of the elements of the crime.

Viewing the evidence in light most favorable to the Commonwealth as the verdict winner, the accumulation of circumstantial evidence in this case was strong enough for a jury to find that Ms. Rabins did not live or die at the Tedesco home and to make the inference that the Tedescos tampered with physical evidence believing an investigation was forthcoming. The evidence here was not so weak and inconclusive that as a matter of law no jury could find the charged crime. The evidence presented as to the tampering with evidence charge can be summarized as follows.

As part of their investigation, the state police searched the apartment on Old Route 115 in Saylorsburg on October 3, 2011. During the search, the police found a lease agreement for the apartment in the names of "Tom Miller and Barbara Rabins" dated February 1, 2008. The application appeared to have been completed by John Tedesco and listed Mr. Miller as his uncle and Ms. Rabins as his aunt. Ms. Rabins was picked up at this apartment several times by emergency personnel when 911 were called to assist her. N.T. 8/6/15 p. 96, 103, 120. Despite the fact that four out of five ambulances called for Ms. Rabins were called to Mr. Miller's apartment, Mr. Tedesco denied that Ms. Rabins was living there full time, but did admit that she stayed there a lot. N.T. 8/12/15 p.236-37. As indicated in their records, Mr. Miller stated to VNA workers that Ms. Rabins had returned to his apartment after her stay in a rehabilitation

14

center. The landlord of the apartment on Old Route 115, Hakija (Harry) Kolenovic, testified that Ms. Rabins was living with Mr. Miller in the apartment and that both were listed as tenants on the lease. N.T. 8/11/15 p.12-15. Mail postmarked to Ms. Rabins was also found at the apartment on Old Route 115. N.T. 8/7/15 p.140. The first responders and coroner responding to the 911 call of Ms. Rabins' death testified that they found the immaculate state of the living room incompatible with the Tedescos' statements regarding Ms. Rabins primarily living and dying in the living room.

Additionally, the Commonwealth presented the testimony of Jillian Viscardi, one of Krystal Tedesco's close friends during the relevant time period. Ms. Viscardi spent a lot of time at the Tedesco home and had frequent sleepovers there during the summer and even the school year. *Id.* at p.198. She could not identify Ms. Rabins in a photograph, said that she never saw Ms. Rabins at the home, that no one in the family ever mentioned Ms. Rabins or an aunt they cared for, and that she never saw any medical equipment like a walker or cane in the house or accommodations made in the bathrooms to assist an elderly person. *Id.* at 200-02. Jennifer Pandolpho, the next door neighbor of the Tedescos, also testified that she never saw an elderly woman at the Tedesco home or heard of one living there until the night Ms. Rabins died. *Id.* at 178. Finally, the jury was presented with the testimony of Mr. Tedesco regarding his care of Ms. Rabins, her living situation, and the night of her death. N.T. 8/12/15 p. 135-245; 8/13/15 p.4-82.

The accumulation of this evidence was such that a jury could find beyond a reasonable doubt that Ms. Rabins was living at the apartment on Route 115 and not the

15

Tedesco home, and that the Tedescos tampered with physical evidence regarding her residence and place of death, believing an investigation into her death was about to begin. There need not be evidence that the Tedescos knew that there was currently an ongoing investigation into the circumstances surrounding Ms. Rabins death, it is enough that they believed an investigation was about to be instituted. The behavior of the Tedescos allowed the jury to draw the inference that they knew an investigation into Ms. Rabins death would be instituted once her body was found in that condition. Reviewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the evidence presented was sufficient for the jury to find each element of the crime of Tampering with Evidence.

### b) The Weight of the Evidence

As noted above in footnote 1, the Defendant raised the issue of weight of the evidence in their Post Sentence Motions but did not brief the issue, instead briefing the issue of sufficiency of the evidence. If the issue of weight of the evidence is considered properly preserved for appeal, the court finds that the verdict was not against the weight of the evidence. In order to grant relief based on a claim that the verdict was against the weight of the evidence, "it must appear that the verdict was so contrary to the evidence as to shock one's sense of justice and make the award of a new trial imperative." *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. 2004), *appeal denied*, 878 A.2d 864 (2005). In reviewing a ruling on a weight of the evidence claim, the appellate court is limited to determining whether the trial court abused its discretion. *See Commonwealth v. Kim*, 888 A.2d 847, 851 (Pa. Super. 2005), *appeal denied*, 899 A.2d

16

1122 (2006). Here, the verdict finding Ms. Tedesco guilty of Tempering with Physical Evidence was not so contrary to the evidence to shock one's sense of justice or make the award of a new trial imperative.

## II.    ABUSE OF DISCRETION IN SENTENCING

Below is a list of the sentences of incarceration Ms. Tedesco received (bolded), with the standard Guideline range for that charge listed below.

1. Murder in the Third Degree:
   **168 to 336 months**
   72 to 240 months

2. Conspiracy- Murder in the Third Degree:
   **168 to 336 months**
   72 to 240 months

3. Theft by Unlawful Taking:
   **12 to 24 months**
   RS to 9 months (aggravated range 12 months)

4. Theft by Failure to Make Req. Disp. of Funds:
   **12 to 24 months**
   RS to 9 months (aggravated range 12 months)

5. Conspiracy- Theft by Unlawful Taking:
   **9 to 18 months**
   RS to 9 months (aggravated range 12 months)

6. Conspiracy- Theft by Failure to Make Req. Disp. Of Funds:
   **9 to 18 months**
   RS to 9 months (aggravated range of 12 months)

7. Conspiracy- Neglect of Care of Dependent Person:
   **3 to 6 months**
   RS to 3 months (aggravated range of 6 months)

17

8. Neglect of Care of Dependent Person:
   **3 to 12 months**
   RS to 3 months (aggravated range of 6 months)

9. Tampering with Physical Evidence:
   **3 to 6 months**
   RS to RS (aggravated range of RIP to 3 months)

The sentences for Murder in the Third Degree, Conspiracy to commit Murder in the Third Degree, Theft by Failure to Make Required Disposition of Funds, Criminal Conspiracy to commit Theft by Unlawful Taking, Criminal Conspiracy to commit Theft by Failure to Make Required Disposition of Funds, Criminal Conspiracy to commit Neglect of Care of a Dependent Person, Neglect of Care of a Dependent Person, were concurrent. The sentences for Theft by Unlawful Taking and Tampering with Physical Evidence were consecutive to the above concurrent sentences. This resulted in Ms. Tedesco receiving a sentence of incarceration in a state correctional institution of no less than 183 months (15.25 years) to 366 months (30.5 years). *Sentencing Order*, October 26, 2015.

Ms. Tedesco argues that the court did not consider any mitigating factors such as the report by Dr. Dattilio indicating that she is a low risk for recidivism, her remorse, and her prior record score of zero, when sentencing her in the upper end of the standard range for Murder in the Third Degree. She also argues that the sentence is unduly harsh or excessive because of the two consecutive sentences in the aggravated range since "these acts all arose from a single ongoing course of conduct." *Brief in Support of*

18

*Defendant's Post-Sentence Motions*, p. 7. The Defendant requests to be resentenced to a term of incarceration which reflects the mitigating circumstances and the nature and character of the Defendant herself.

The standard of review in sentencing matters is well settled:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Hoch*, 936 A.2d 515, 516 (Pa. Super. 2007) (citing *Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa. Super. 2006)). Assuming the court's sentencing decision is procedurally sound, the appellate court considers if the sentence is substantively reasonable under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). "When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness." *Id.* The trial court is afforded "broad discretion in sentencing criminal defendants 'because of the perception that the trial court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it'." *Commonwealth v. Mouzon*, 812 A.2d 617, 620 (Pa. 2002) (quoting *Commonwealth v. Ward*, 568 A.2d 1242, 1243 (1990)).

19

At the sentencing hearing, it was noted that two aggravating factors were listed in the Pre-Sentence Investigation for Ms. Tedesco. First, she has had three separate misconducts since being incarcerated, and second, that the victim, Ms. Rabins, was mentally disabled. N.T. 10/26/15 p.2-3. During sentencing, defense counsel argued that Ms. Tedesco was an extremely low risk for re-offending, had no prior record, was very active in her community, has accepted responsibility for her actions, and that her actions were not malicious. *Id.* at 2-6. Several relatives of the Tedescos also spoke on their behalf and wrote letters of support. *Id.* at 8-16.

First, the sentence imposed for Murder in the Third Degree is well within the standard range, and is therefore presumptively reasonable. Second, although the Defendant was sentenced in the aggravated range for Theft by Unlawful Taking and Tampering with Physical Evidence, sufficient reasons for aggravation were stated on the record at sentencing. Although the Court did not note the reason for aggravation as to those specific charges, the aggravating circumstances in this case were discussed at length at the sentencing hearing. The Court noted that Ms. Rabins had the mental capacity of a child and was "wide open to be taken advantage of" by the Tedescos who "were getting used to this flow of money coming into the household that was supplementing their ability to maintain a lifestyle that it's obvious they and their family were happy with." *Id.* at 24. The Tedescos were told that Ms. Rabins needed full time care by several nursing facilities and agencies who were concerned for her well-being. The Tedscos did not obtain that care be provided to her despite their continual receipt of money for such care from the trust. When Ms. Rabins was released from the nursing

20

home to the apartment on Old Route 115 Ms. Rabins "existence had to be pure hell." *Id.* at 26. The condition Ms. Rabins was left in was "horrible" and she "basically went through torture" the last year of her life. *Id.* at 26. The Court further noted that Ms. Tedesco knew that Ms. Rabins was not being properly taken care as they used her money to take a vacation to Wildwood while she was suffering alone in the apartment. *Id.* at 27.

Third, there is no abuse of discretion here where the Defendant's sentences for Theft by Unlawful Taking and Tampering with Physical Evidence are to run consecutive to the other sentences. "Generally, Pennsylvania law affords the sentencing court discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed" *Commonwealth v. Prisk*, 13 A.3d 526, 533 (Pa. Super. 2011). With consecutive sentences, the question becomes "whether the decision to sentence consecutively raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at issue in the case." *Commonwealth v. Mastromarino*, 2 A.3d 581, 588 (Pa. Super. 2012). Ms. Tedesco's aggregate sentence of 15.25 years to 30.5 years is not excessive in light of the criminal conduct at issue in this case. The facts of the case outlined in this opinion, including the prolonged suffering of Ms. Rabins and the theft of funds from a mentally handicapped individual as discussed at the time of sentencing, warrant the sentence imposed.

Additionally, the Court was privy to a pre-sentence report regarding the Defendant Ms. Tedesco and "[w]here the sentencing judge has the benefit of a pre-

21

sentence report, it shall be presumed that 'the sentencing judge was aware of the relevant information regarding the defendant's character and weighed those considerations along with the mitigating statutory factors'." *Commonwealth v. Bruner*, 564 A.2d 1277, 1289 (Pa. Super. 1989) (quoting *Commonwealth* v. *Devers, 546 A.2d 12, 18 (Pa. 1988))*. In the instant case, the Court acknowledged receipt and review of the pre-sentence investigation, including the report from Dr. Dattilio, during the Defendant's sentencing. N.T. 10/26/2015 p.2. The Defendant's claim that the Court did not consider the mitigation presented, including the report from Dr. Dattilio, is without merit.

Finally, the Defendant has pointed to no sign of prejudice, ill will, or bias that would render the decision manifestly unreasonable. Again, the sentence for Murder in the Third Degree is within the guideline range and is therefore presumptively reasonable. In sentencing the Defendant, the Court reviewed the PSI, letters from the victim's family, letters from the Defendant's family and friends, and fashioned an aggregate sentence based on the evidence presented at trial and the jury's ultimate finding of guilt as to all charges. Because of the torture and abuse suffered by the Victim, who was mentally handicapped, at the hands of the Defendants for their own gain, the consecutive sentences did not result in an excessive aggregate sentence. The Court did not abuse its discretion in sentencing Ms. Tedesco.

## III.    THE *BRUTON* ISSUE

Ms. Tedesco further alleges that the trial court erred in admitting grand jury testimony of a co-defendant, namely Mr. Tedesco, in violation of *Bruton*. Defendant's

22

*Amended Post-Sentence Motions*, ¶¶ 2-4. The following discussion occurred regarding the *Bruton* issue:

MR. MANCUSO: The Commonwealth has, Your Honor, marked for identification Commonwealth's exhibit No. 93. These are the notes of testimony dated March 26, 2013, before the county investigative grand jury No. VI of Defendant John Tedesco, Your Honor. I offer 93. With the Court's permission, I have certain portions of it that I'd like to be read into the record by the trooper.

THE COURT: Any objection?

MS. SPISHOCK: Your Honor, could we approach?

THE COURT: Yes.
(The following discussion was held on the record at sidebar)

. . .

MS. SPISHOCK: I haven't looked at the grand jury testimony. I don't know if there's any Bruton issues in here.

THE COURT: I think that was one question I have.

MR. MANCUSO: There's one segment which I've redacted and the trooper knows, and he's going to say "the other person" in exchange for Mrs. Tedesco.

THE COURT: Do you have that?

MR. MANCUSO: Page 58, from line 13 through line 25 – "my wife" has been removed. "It was hard for the other person to take care of her by herself." That's the only Bruton issue.

THE COURT: Any specific objection at this point? I mean, you can raise it as you hear the testimony.

MS. SPISHOCK: Right. No, just as long as we don't go into the Bruton line.

23

MR. MANCUSO: Sure.

N.T. 8/11/2015 p.144-46.

Trooper De La Iglesia then read the grand jury transcript into the record. One of the grand jury questions read was, "So would you guys split the duties taking care of Barbara, you and your wife, or would it primarily be you?" In response, Mr. Tedesco answered, "I had to change Barbara." At no point during the reading of the grand jury testimony did defense counsel object. *Id.* at 152.

A defendant's Constitutional right to confrontation is violated when statements of a non-testifying co-defendant that implicate the defendant are presented to the jury at their joint trial. *Bruton v. United States*, 391 U.S. 123, 128 (1968). Where the defendant is implicated by the co-defendant and is unable to cross-examine them, a limiting instruction given to the jury to disregard the statements as to the defendant is not sufficient to cure the prejudice against that defendant. *Id.* at 137.

Over time, the Court has further defined the rule in *Bruton* to find that there may be various remedies to avoid a Confrontation Clause violation in such circumstances. *See Commonwealth v. Overby*, 809 A.2d 295, 302 (Pa. 2002). Following the jurisprudence developed by the Supreme Court, the Supreme Court of Pennsylvania has held that "consistent with *Bruton*, the Commonwealth could introduce a redacted statement into evidence at a joint trial only if that statement did not refer to the other defendant." *Id.* (citing *Commonwealth v. Johnson*, 378 A.2d 859 (Pa. 1977)). Although replacing the co-defendant's name with a symbol, the word "deleted", or a blank space, is not sufficient to remedy the *Bruton* violation, *Gray v. Maryland*, 118S.Ct. 1151,1152

24

(1998), where the co-defendant's name is replaced by "the other man," and a limiting instruction is given, there is no Confrontation Clause violation. *Commonwealth v. Travers*, 768 A.2d 845, 845-46 (Pa. 2001). *See also Commonwealth v. Lopez*, 739 A.2d 485, 499-500 (1999) (statement referring to "other guys" complied with *Bruton*).

Here, there was a redaction of a reference to Ms. Tedesco in Mr. Tedesco's grand jury testimony, replacing "my wife" with "the other person". N.T. 8/11/15 p.144-46. Although the later reference to "your wife" should have been redacted pursuant to *Bruton* as the other reference to Ms. Tedesco was, counsel did not object upon the reading, as discussed by the Court at sidebar. Therefore, the Court could not give an instruction for the jury to disregard that statement at the time it was read.

Further, unlike the statements made in *Bruton* that directly implicated the co-defendant in the crime, Mr. Tedesco's response did not directly implicate his co-defendant Ms. Tedesco. Instead Mr. Tedesco implicated only himself as the one who was responsible for changing Ms. Rabins. This is not the typical case of a co-defendant attempting to shift blame to the defendant or minimize his own culpability, thereby creating a prejudicial inference of the defendant's guilt. The grand jury testimony only linked Ms. Tedesco to the crimes through other evidence properly admitted against her at trial, and not directly by Mr. Tedesco implicating her as a co-defendant.

Although the Defendant further claims "the Court did not give an instruction to the jury regarding the *Bruton* implications[3]," the following instruction was given to the jury at the close of the trial:

---

[3] *Brief in Support of Defendant's Post-Sentence Motions*, p. 10.

"In this case the Commonwealth introduced evidence of recorded and nonrecorded interviews, testimony, and statements of the Tedescos during trial. There's a rule that restricts your use of this evidence. A statement made by a Defendant before trial may be considered as evidence only against that particular Defendant who made the statement. Thus you may consider John Tedesco's statements as evidence against him if you believe he made the statement voluntarily. You must not, however, consider the statement as evidence against Tina Tedesco. You must not use the statement in any way against her. Likewise, you may consider the statements Tina Tedesco made as evidence against her if you believe she made them voluntarily. You must not, however, consider her statements as evidence against John Tedesco. You must not use the statements in any way against him."

N.T. 8/14/15 p.238-39.

Ms. Tedesco was sufficiently insulated from *Bruton* prejudice through redaction and the limiting instruction. Defense counsel did not object at the time the reference to "your wife" was made. Mr. Tedesco's answer did not directly implicate Ms. Tedesco. Therefore, the statement and accompanying answer by Mr. Tedesco at issue did not produce a sufficient inference of guilt to prejudice the defendant beyond repair by the limiting instruction.

## IV.    EXPERT TESTIMONY OF NURSE BLANCHARD-DORAN

Ms. Tedesco contends that the trial court erred in allowing Nurse Blanchard-Doran to testify as an expert in the staging of pressure ulcer despite the fact that she had not been questioned or cross-examined regarding her qualifications specific to these types of wounds. *Defendant's Amended Post-Sentence Motions*, ¶ 8. The Defendant also argues that Nurse Blanchard-Doran should not have been admitted as an expert witness at all because no notice was provided that the Commonwealth intended to call her as an expert witness, no report exists as to her expert opinion, and

26

no curriculum vitae was provided. *Brief in Support of Defendant's Post-Sentence Motions*, p. 10-11.

The following discussion regarding the testimony of Nurse Blanchard-Doran as an expert witness was held at sidebar:

MS. SPISHOCK: Your Honor, I'm going to object. She's not been qualified as an expert in staging wounds.

THE COURT: Counsel approach.
(The following was a record held at sidebar on the record)

THE COURT: She wasn't called as an expert or qualified as an expert. She was called as a fact witness, but you are getting into the area of asking her expertise. So if you are going to do that, then –

MR. MANCUSO: I'll lay the foundation.

THE COURT: -- we should give the other side an opportunity to question qualifications and that kind of thing if you are going to call her for expert testimony.

MR. MANCUSO: Sure. Your Honor, I'll hold the photo, and I'll ask the qualification questions and the yield the floor for voir dire.

N.T. 8/7/15 p. 52. Following this discussion, the Commonwealth elicited testimony regarding Nurse Blanchard-Doran's qualifications in the field of geriatric nursing including courses she has taken in wound care and her experience with dysphasia. *Id.* at 53-55. Counsel for the defense then questioned Nurse Blanchard-Doran on her qualifications. *Id.* at 55-56. Nurse Blanchard-Doran was then received as an expert in geriatric nursing. *Id.* at 56. No expert report was entered or created by Nurse Blanchard-Doran in this case.

Pennsylvania Rule of Evidence 702 Testimony by Expert Witnesses, is as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. "Determining whether a witness may testify as an expert is a matter within the sounds discretion of the trial court, whose decision will only be reversed for a clear abuse of discretion." *Yacoub v. Lehigh Valley Medical Assoc .P.C.*, 805 A.2d 579, 591 (Pa. Super. 2002). In order to qualify as an expert in a specific field, the witness "must possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience. *Id.* The standard for qualification of an expert under Pennsylvania law is a liberal one and the test to be applied is whether the witness has a reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight given to that testimony is for the fact-finder to determine. *Commonwealth v. Gonzalez*, 546 A.2d 26, 31 (Pa.1988). "It is also well established that an expert may render an opinion based on training and experience; formal education on the subject matter is not necessarily required." *Commonwealth v. Copenhefer*, 719 A.2d 242, 254-55 (Pa.1998) (*citing Miller v. Brass Rail Tavern, Inc.*, 664 A.2d 525, 528 (Pa.1995)). *Com. v. Puksar*, 740 A.2d 219, 226 (Pa. 1999).

28

The Pennsylvania Rules of Criminal Procedure state that the Commonwealth must provide to the defense the following requested information or items provided they are material to the case:

> any results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant that are within the possession or control of the attorney for the Commonwealth

Pa.R.Crim.P. 573(B)(1)(e).

Nurse Blanchard-Doran was admitted as an expert in geriatric nursing, not specifically an expert in the care of pressure ulcers or staging wounds. Although no curriculum vita was provided for Nurse Blanchard-Doran, the Commonwealth did elicit her qualifications specific to nursing in general and her experience with pressure ulcers in elderly patients on direct examination. N.T. 8/7/15 p.53-56. Her expertise in geriatric nursing qualifies her to discuss pressure ulcers and wounds and her knowledge of them as they relate to geriatric patients. She is not required to be admitted as an expert in pressure ulcers and their staging specifically, as the Defendant contends in her brief, to be qualified to discuss pressure ulcers in geriatric patients. Further, the Commonwealth did not violate the Rules of Criminal Procedure regarding disclosure because no expert report or opinion was generated by Nurse Blanchard-Doran in relation to this case, and at no time during the trial did the defense object to the fact that Nurse Blanchard-Doran did not generate a report as to her expert opinion, therefore this issue was waived.

## V.   ADMISSION OF EVIDENCE ALLEGEDLY NOT PROVIDED TO THE DEFENSE

Ms. Tedesco contends that the trial court erred in allowing the Commonwealth to present at trial various items and records which were not given to the defense prior to

trial in violation of Pennsylvania Rule of Criminal Procedure 573. *Defendant's Amended Post-Sentence Motions*, ¶¶ 9-12. Specifically, the defense argues that the records from Ms. Leinwand, the administrator of Ms. Rabins' trust, and the items that were contained in a purse belonging to Ms. Rabins were not disclosed by the Commonwealth and should therefore not have been admitted against defense objections. *Id.*

Pennsylvania Rule of Criminal Procedure 573(B) enumerates items that are mandatory for the Commonwealth to disclose upon the defendant's request if they are material to the case, and provides that when applicable, the Commonwealth shall "permit the defendant's attorney to inspect and copy or photograph such items." Pa.R.Crim.P. 573(B)(1). This list includes mandatory disclosure of "any tangible objects, including documents, photographs, fingerprints, or other tangible evidence." *Id.* at (B)(1)(f). Further, "if prior to or during trial, either party discovers additional evidence or material previously requested or ordered to be disclosed by it, which is subject to discovery or inspection under this rule, [. . .] such party shall promptly notify the opposing party or the court of the additional evidence." *Id.* at (D).

In order for a conviction to be reversed based on the improper withholding of evidence, there must be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 680 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* "[H]armless error exists in three alternative scenarios: where the error did not prejudice the defendant or the prejudice was *de minimis*, the erroneously admitted evidence was merely cumulative of other untainted

30

evidence which was substantially similar to the erroneously admitted evidence, or the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Chmiel*, 889 A.2d 501, 521 (citing *Commonwealth v. Smith*, 861 A.2d 892 (Pa. 2004)).

The following discussion occurred regarding the evidence in question:

MS. BLEICE: Your Honor, we briefly – Mr. Saurman and I had a chance to review what's in 16. I don't believe it's something that I've seen.

THE COURT: This is Exhibit 37. You are talking about the overall exhibit 37?

MS. BLEICE: Correct.

MR. SAURMAN: The lease we've seen. The lease I have a copy of. I've never seen these handwritten notes from Ms. Rabins. They are not in discovery. At least they are not – you know, we have got tons of discovery, but I think I've gone through it fairly carefully, and I've never seen copies of those.

THE COURT: Why don't we hold those. Will you check to see if they were –

MR. MANCUSO: Can I start at the beginning? What the witness has been shown are items he collected as evidence that were logged into evidence.

THE COURT: Um-hum.

MR. MANCUSO: There were property records sent in discovery containing those items.

THE COURT: Containing everything that was contained inside the envelope?

MR. MANCUSO: No, identifying what was seized or processing of the apartment.

THE COURT: On the cover sheet of the –

MR. MANCUSO: Yes. And under the rules of discovery, there's a right to inspect any items that were seized into evidence. It's been my experience that not every item seized is photocopied and made part of the report.

31

**Counsel** had the opportunity – and I don't mind them looking at it now, but they had the opportunity for months, if not over a year or more, to inspect all the items that were seized by the police both at the search of the house of the Defendants and the subsequent search of the apartment.

**MS. SPISHOCK:** Are these property records that just came in like a week or so ago?

**MR. MANCUSO:** No.

**MS. SPISHOCK:** Because we just got a pack of property records.

**MR. MANCUSO:** You did. As evidence is moved around, some sent to the lab, some sent; for instance, to the DA's office, property records are updated. The signatures—people sign for them, but the actual property records that we had initial seizure were part of the original discovery packet in this case, the first 700 pages or so. And they go from the incident number, and then there's later addendums each given a latter, and I think we're up to J, if I remember correctly. So all I'm saying is –

**THE COURT:** Were these—was this paperwork identified in the cover sheet that was sent over in discovery?

**MR. MANCUSO:** In the cover sheet as police reports, yes. As property records, no. They are contained as part of the police reports.

**MS. BLEICE:** So there's no notice that there's letters from the decedent that apparently they are planning on introducing into evidence. I mean—

**MR. MANCUSO:** Let me get the property records. You could see what I'm referring to.

**MS. BELICE:** Okay.

**MR. MANCUSO:** This is the property record in question, Your Honor. There is three items listed. And item No. 2 –

**THE COURT:** Documents that are –

**MR. MANCUSO:** Miscellaneous documents. So that puts the Defense on notice there's evidence to look at. You set up a time or contact me directly, and we always make that available.

32

THE COURT: Uh-huh.

MR. SAURMAN: Judge, there's a big difference between a letter, which is readily copied and give us a copy of. They copied the lease. And the other papers they are going to introduce, the content of which we haven't seen, this is not – we're not talking about –

MR. MANCUSO: The lease agreement wasn't copied. Also, there was another copy of the lease agreement provided by the landlord. That was entered into along with the application. But if you look at the lease agreement, it's pretty fragile and dirty. It wasn't copied and made part of the report.

MR. SAURMAN: It's one thing to have physical evidence and say you can inspect it if you are talking about – not in this case, but shell casings or in this case the furniture, the things that were swabbed, those are things you can inspect and have your people look at. And it's understood you are not going to get a copy of those because they are physical items. When you are dealing with a piece of paper that can readily be copied, there's absolutely no reason not to turn it over, and then to come now and say, well, they knew it was on the report is—

THE COURT: I don't know. Why wouldn't you look at the list and say, I want to see what these documents say.

MR. SAURMAN: Because the expectation and the assumption is, and this is an assumption, but it's a reasonable one, is that we were going to get copies of any documents that are copied. They are supposed to give us full and complete discovery. To take something down and then sneak it in later I think is unreasonable.

THE COURT: I'm not going to – you knew that there were documents there. They were available. They could be inspected. So that to me, that's a problem for the Defense lawyer, but there may be – are there any issues as far as the rules of evidence are concerned with the documents themselves?

N.T. 8/7/15 p. 133-37. The Court then accepted the evidence subject to the right of the defense to raise evidentiary issues after they have inspected them. Id. at 138. A two-page lease agreement and spiral notebook were received into evidence as Commonwealth exhibit No. 37 after the defense was provided with an opportunity to

33

review them. Later, a similar objection was lodged as to the introduction of miscellaneous documents found in the Tedesco master bedroom. Id. at 155-57. The Commonwealth then stated, "just so the record is clear, these items were always available for inspection, and they are identified on the property records that were supplied to both counsel." Id. at 156. The documents were then reviewed by the defense and received into evidence against no objection. Id. at 157.

The defense similarly contends that several documents from Ms. Rabins' trust administrator were entered into evidence in violation of pre-trial discovery. N.T. 8/10/15 p. 43. The trust documents were documents that Ms. Leinwand, the administrator of the trust, had brought with her and given to the Commonwealth upon her arrival. They were not in the possession of the Commonwealth to give to the defense during pre-trial discovery and were turned over to the defense as soon as they were in the Commonwealth's possession. *Id.* at 44. Mr. Mancuso for the Commonwealth stated that "[a]t the earliest opportunity I put both on counsel table prior to 8:30 this morning. As soon as I saw both counsel, I explained what it was and when I got it." *Id.* at 45.

The Commonwealth did not violate the rule of pre-trial discovery with regards to any of the aforementioned evidence. Rule 537(B) was not violated as the Commonwealth provided a complete list of the documents and items in their possession to the defense. The records were available for inspection and copying. The Commonwealth also properly abided by Rule 537(D) with regard to the evidence they received from Ms. Leinwand when they promptly notified and provided a copy of the documents to counsel upon their receipt. The Commonwealth "does not violate

34

discovery rules where it does not provide defendant with evidence that it does not possess and of which it is unaware during pretrial discovery." *Commonwealth v. Flood*, 672 A.2d 1193, 1200-01 (Pa. Super. 1993).

Further, even if it were found that the Commonwealth did violate the rules of discovery and evidence was improperly admitted, it was harmless error. The evidence complained of was merely cumulative evidence of facts already established by the Commonwealth. The staggering amount of evidence and testimony presented as to the same facts in this case effectively renders the complained of documents harmless. The complained of exhibit No. 37 includes a two page lease agreement, a spiral notebook containing handwritten notes of Ms. Rabins including lists of items she wished to purchase, and several miscellaneous letters written by Ms. Rabins. If admitted improperly, the items did not put forth material facts not already testified to or established by other Commonwealth evidence, and therefore were cumulative. Although the defense argues that the "amount of evidence which was not disclosed to counsel[4]" prejudiced the Defendant, more specificity is required to show that Ms. Tedesco suffered harm by the alleged lack of disclosure and admission of these items. The Defendant did not object to any specific documents and identify their prejudicial effect. Therefore, the Court properly admitted the aforementioned evidence, and if the admission was in error, the Defendant is still not entitled to a new trial because of the harmless nature of the alleged error.

---

[4] *Brief in Support of Defendant's Post-Sentence Motions*, p. 14.

35

## VI.   FACT WITNESS JILLIAN VISCARDI

Ms. Tedesco claims that the trial court erred in allowing the Commonwealth to call Jillian Viscardi to testify when she was never disclosed as a potential witness to the Defense. *Defendant's Amended Post-Sentence Motions*, ¶¶ 15-18. The following discussion was held at sidebar regarding Ms. Viscardi's testimony:

MR. SAURMAN:   Your Honor, my objection would be that – I understand we just had an offer of proof. Obviously, at some point down the line, someone, a trooper, somebody has interviewed this witness. We have not –

. . .

MR. SAURMAN:   Someone would have had to interview her at some point to find out what she's going to say. We've had no evidence. We have no statements. We have nothing. So they are producing a witness now for the first time with no notice to give us a chance to talk to her as well.

MR. MANCUSO:   Mr. Mancuso, myself, was the first to talk to her, and that was when she was identified by Laura Klotz in a photograph dateable to July of 2011 in the company of the Tedescos. So there was no statement.

THE COURT:   There are no police reports or interview of her?

MR. MANCUSO:   Correct. Yes, sir.

MS. SPISHOCK:   When was that interview with Klotz?

MR. MANCUSO:   July

MS. SPISHOCK:   Of this year?

MR. MANCUSO:   Yes

MS. SPISHOCK:   We didn't have notice of this.

THE COURT:   Is that required notice under the discovery rule?

36

MR. MANCUSO:    No, it's not. It was in the course of trial prep that I talked to Ms. Klotz, and the identity of who the other girl in the photograph was revealed.

THE COURT:    All right. Objection overruled.

N.T. 8/7/15 p.189-90.

Pennsylvania Rule of Criminal Procedure 573 Pretrial Discovery and Inspection lists the following disclosure by the Commonwealth as mandatory when requested by the defendant and material to the instant case:

(a) Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth;

(b) any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made that is in the possession or control of the attorney for the Commonwealth;

(c) the defendant's prior criminal record;

(d) the circumstances and results of any identification of the defendant by voice, photograph, or in-person identification;

(e) any results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant that are within the possession or control of the attorney for the Commonwealth;

(f) any tangible objects, including documents, photographs, fingerprints, or other tangible evidence; and

(g) the transcripts and recordings of any electronic surveillance, and the authority by which the said transcripts and recordings were obtained.

Pa.R.Crim.P. 573(B)(1)(a-g). Additionally, the rule provides for discovery that is discretionary with the court, where the court may order the Commonwealth to allow the

defendant's attorney to inspect and copy or photograph any of the following items upon a motion for pretrial discovery if they are material and the request is reasonable:

> (i) the names and addresses of eyewitnesses;
> (ii) all written or recorded statements, and substantially verbatim oral statements, of eyewitnesses the Commonwealth intends to call at trial;
> (iii) all written and recorded statements, and substantially verbatim oral statements, made by co-defendants, and by co-conspirators or accomplices, whether such individuals have been charged or not; and
> (iv) any other evidence specifically identified by the defendant, provided the defendant can additionally establish that its disclosure would be in the interests of justice.

Pa.R.Crim.P. 573(B)(2)(a)(i)-(iv). Since the pretrial submission by the prosecution to defendant of a witness list is discretionary under the rule, the court may permit witnesses not on the list to testify. *Commonwealth v. Shinn*, 16 Pa. D&C 3d 326, 332 (1980). There is no requirement that the Commonwealth disclose the name and addresses of all witnesses. *Commonwealth v. Colson*, 490 A.2d 811, 823 (Pa. Super. 1985).

Here, Ms. Viscardi's existence or that the Commonwealth intended to call her as a witness did not fall under requirements of mandatory discovery. Ms. Viscardi was discovered through diligent trial preparation by the Commonwealth. She was well known to the Tedescos, and her testimony concerned day to day activities in their home and their vacations, which came as no surprise to them. Ms. Tedesco contends that disclosure of Ms. Viscardi's interview with Mr. Mancuso in preparation for trial is required under Rule 573(B)(2)(a)(i) and (ii) upon their motion for pre-trial discovery as an eyewitness. *Brief in Support of Defendant's Post-Sentence Motions*, p.16. This section of the discovery rule does not apply to Ms. Viscardi as she was not an

38

eyewitness to the crime. *See Commonwealth v. Jones*, WL 371567 *19 (Pa.Com.Pl. 1990) (holding a person who is present at the scene of the crime but did not see the crime occur is not an "eyewitness" and therefore, their identity is not discoverable). In fact, Ms. Viscardi's testimony established that she had never seen or even heard of Ms. Rabins. N.T. 8/7/15 p.200. It is also understood that Ms. Viscardi was identified from a photograph that was provided to the defense in discovery and that the Tedescos were aware of her identity as she was a friend of her daughter throughout 2010 and 2011. Further, Ms. Tedesco's right to confrontation was not violated as Ms. Viscardi was subject to cross-examination.

Finally, the Defendant contends that "[t]he fact that Attorney Mancuso interviewed Ms. Viscardi without anyone else being present violated Rule 3.7 of the Pennsylvania Professional Rules of Conduct" that states that an attorney "shall not act as an advocate at trial in which the lawyer is likely to be a necessary witness." *Brief in Support of Defendant's Post-Sentence Motions*, p.17. No such violation occurred in this case where Attorney Mancuso was not likely to become a necessary witness. His interview with Ms. Viscardi was in the normal course of trial preparations. The purpose of this rule, as noted in the explanatory comments, is to prevent the jury from being confused or mislead by an attorney serving as both an advocate and a witness. Pa.R.P.C. 3.7, Explanatory Comment 2. Facts giving rise to a violation of Rule 3.7 do not exist in this case where it was not likely that Attorney Mancuso would become a necessary witness at trial, and where he did not in fact become a witness at trial.

## VII. TESTIMONY OF CORPORAL GROSS

Ms. Tedesco contends that the trial court erred in allowing Corporal Gross' testimony regarding the condition of Ms. Rabins' body at the autopsy because it was cumulative and prejudicial[5]. At trial, Defense counsel objected to the testimony of Corporal Gross as cumulative. N.T. 8/7/15 p.214. As Corporal Gross began to testify as to his observations of the body while present at the autopsy, Defense counsel objected:

> "The objection is, Your Honor, that other people have already testified to this evidence. I believe that it's cumulative. I believe Dr. Land testified to it. I believe the coroner has already testified to it. I believe the EMT has already testified to it. It's cumulative at this point."

*Id.* The Commonwealth countered that Corporal Gross could testify as to his observations. *Id.* The Court allowed Corporal Gross to testify as to his observations "without belaboring the point" since there was evidence presented on the autopsy and state of Ms. Rabins' body already. *Id.* After the objection, Corporal Gross merely testified that Ms. Rabins was wearing a t-shirt and adult diaper that had feces and urine in it. *Id.* at 215. An objection was then sustained as to Corporal Gross testifying about the release of feces upon death, and he moved on to testifying about how the investigation progressed from there. *Id.* at 216-217.

Pennsylvania Rule of Evidence 403 is as follows:

> The Court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

---

[5] *Amended Post Sentence Motions*, ¶¶ 13-14. Defense did not object to the prejudicial nature of this testimony at trial, and therefore did not preserve the objection. Therefore, this opinion will only address the motion regarding cumulative evidence.

Pa.R.E., Rule 403. Pursuant to this rule, cumulative evidence is repetitious and may be properly excluded within the discretion of the court. *See Baker v. Morjon, Inc.* 574 A.2d 676, 679 (Pa. Super. 1990).

The testimony of Corporal Gross about the state of Ms. Rabins body as he observed it at the autopsy was limited. He testified that Ms. Rabins was dressed in a t-shirt and adult diaper with feces and urine in it. He did not testify further as to the state of her body. Although testimony regarding the state of Ms. Rabins' body was previously elicited, albeit in a much more graphic fashion, Corporal Gross' testimony regarding his observations at the autopsy was necessary to explain why he then initiated the investigation into Ms. Rabins death. The probative value of this very limited testimony was not outweighed by needlessly presenting cumulative evidence. Further the defendant has failed to show how Corporal Gross' limited testimony about the state of Ms. Rabins' body prejudiced her. The motion has no merit.

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FOURTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA, :      NO.  2229 CR 2013

                      vs.                       :

TINA TEDESCO,                 :

        Defendant           :

## ORDER

**AND NOW**, this 3rd day of March, 2016, upon consideration of Tina Tedesco's

Post-Sentence Motion and the briefs and arguments of both sides, the Post-Sentence

Motion is **DENIED**.

                                          **BY THE COURT:**

                                          **ARTHUR L. ZULICK, J.**

cc:    Robin A. Spishock, Esq.
        Chandra Vitelli-Bleice, Esq.
        Kelly Lombardo, Esq.
        Michael Mancuso, Esq.

ALZ2016-009

42

# COURT OF COMMON PLEAS OF MONROE COUNTY
## 43RD JUDICIAL DISTRICT
## COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
     Vs

2229 CR 2013

TINA TEDESCO

**OPINION/ORDER**

**District Attorney  (2 copies)** _Michelle Chase_    Date _3/4/16_

**Public Defender (2 copies)** _Cme_    Date _3/4/16_

_need 1 more copy PD._

I, Mindy Ditmars, depose the said attached Opinion/Order in the above mentioned manner on March 3 2016.

_Mindy Ditmars_

**Mindy Ditmars, Clerk**

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA, : No. 2229 CR 2013
:
vs. :
:
TINA TEDESCO, :
:
Defendant :

## OPINION

Defendants John Tedesco and Tina Tedesco were charged with Third Degree Murder, Neglect of the Care of a Dependent Person, Criminal Conspiracy, Theft and Tampering with Evidence on July 9, 2013. These charges arose from the August 18, 2011 death of Barbara Rabins, a single woman with physical and mental disabilities, then 70 years of age. The Tedescos filed Omnibus Pretrial Motions on January 28, 2014. A hearing on the motions was held on February 27, 2014. The parties were given leave to file briefs after the transcript of the omnibus hearing was prepared. This opinion addresses the issues raised in Tina Tedesco's omnibus pretrial motion.

## FINDINGS OF FACT

I make the following findings of fact for purposes of Pa.R.Crim.P. 581 (I) from the evidence presented by the parties at the omnibus hearing.

1. John Tedesco and Tina Tedesco resided at 102 Corine Way, Saylorsburg, Pennsylvania with their children in 2011. John Tedesco was a building supervisor in New Jersey and his wife, Tina Tedesco was a homemaker who worked occasionally as a substitute teacher.

1



2. Barbara Rabins was 70 years old at the time of her death on August 17, 2014. The Tedescos told the police that she was living in their home when she died, but the evidence suggests that she was living in an apartment on Route 115 in the Saylorsburg area.

3. John Tedesco met Barbara Rabins through his employment years before. Ms. Rabins was mentally and physically disabled and was not capable of taking care of herself. The Tedescos provided care for her for twelve years and were paid for their services.

4. Barbara Rabins did not have close family members. The family she did have resided out of state and was estranged from her. Her father established a trust fund for her before his death, which was paying the Tedescos for her care.

5. The Tedescos received $1,550 per month in rent and $450 per month for incidental expenses from the Barbara Rabins trust. Tina Tedesco was also the payee of her social security funds in the amount of $1,300 per month. The Rabins trust fund also paid the Tedescos household utility bills. These payments were made to the Tedescos in exchange for their agreement to provide for her care.

6. Cindy Skrzypek of the Monroe County Coroner's Office was called to the Tedesco home at 03:13 on August 18, 2011, with a report that an elderly female had died. *Preliminary hearing transcript,* p.46. When she arrived, Barbara Rabins' body was slumped in a wheelchair in the Tedesco living room. John Tedesco and Tina Tedesco were present. John Tedesco reported that he had gone to work at 19:30. Tina Tedesco

2

stated that when she went to bed at 23:30, Ms. Rabins appeared to be asleep in her wheelchair. John Tedesco found the body when he returned home at 02:54.

7. Barbara Rabins was pronounced dead by the Monroe County Coroner's Office on August 18, 2011 at 04:19. Ms. Skrzypek was suspicious of the circumstances of Ms. Rabins' death, due to extensive injuries and the general condition of the body which appeared to have resulted from neglect. She arranged for an autopsy and contacted the Pennsylvania State Police.

8. An autopsy was done of Barbara Rabins' remains on August 19, 2011 by Sam Land, M.D., a forensic pathologist in Allentown, Pennsylvania. The pathologist found that at the time of her death Ms. Rabins was wearing an adult disposable diaper that was wet with urine, feces and blood. *Autopsy report, page 3.* She suffered from pressure ulcers on her chest, thighs, legs, feet, right elbow and forearm, back, lower back and buttocks and hand. *Autopsy report of Dr.Land; Report of Elaim Matlock, L.P.N.* Photographs of the decedent's body at the time of the autopsy showed that her arms and hands were dirty and covered in feces, with feces under her overgrown fingernails. *Matlock report.* Several of the ulcers were large and deep. The large stage 4 ulcer on her back and buttocks was exacerbated by her incontinence and malnutrition. Id. The skin and underlying tissue in her vaginal area suffered injury from sitting in urine and feces. Id.

9. Ms. Rabins weighed 116 pounds at the time of her death. *Autopsy report.* On

3

July 14, 2010 she weighed 219 when she was discharged from Forest Manor Health Care Center of Hope, New Jersey. *Discharge Summary of Forest Manor Health Care Center, July 14, 2010, Com. Preliminary Hearing Exhibit 57.*

10. The pathologist found a piece of cheese lodged in Barbara Rabins windpipe. He also found that she was dehydrated. Cause of death was determined to be "hypernatremic dehydration with aspiration of food bolus." *Autopsy Report of S. Land, page 3. Com. Preliminary Hearing Exhibit 57.*

11. Corporal William Gross of the Pennsylvania State Police was present for the autopsy. *Preliminary hearing transcript, p. 8.*

12. The Pennsylvania State Police submitted an application to District Magisterial Judge Jolana Krawitz on August 24, 2011, for a search warrant for the Defendants' residence, vehicles and out-buildings at 102 Corine Way, Saylorsburg, Ross Township, Monroe County, Pennsylvania.

13. Judge Krawitz authorized the search warrant on August 24, 2011.

14. The Pennsylvania State Police executed the warrant and conducted a search of Defendants' residence on August 24, 2011.

15. Tina Tedesco was at home at the time of the search. John Tedesco returned to the home as the police officers were concluding the search.

16. The state police found a State Farm Life Insurance Policy on a dresser in the Tedesco master bedroom during the search. The policy insured Barbara Rabins' life for $100,000 and named John and Tina Tedesco as beneficiaries. The policy identified the Tedescos as Barbara Rabins' niece and nephew. *Com. Exhibit 39, Preliminary hearing.*

4

17. At the conclusion of their search, the state police asked the Tedescos to come to the state police barracks to speak with the police about the Tedescos' care of Barbara Rabins and the circumstances of her death. NT 23. The troopers then left.

18. The Tedescos drove from their home to the barracks about 30 minutes after the troopers completed their search of the defendants' home. NT 23. They arrived at the barracks at approximately 18:15. NT 23, 57.

19. At the barracks, the Tedescos were met by Trooper Bonin. They signed in on the barracks visitors' log and were escorted to separate interview rooms. NT 57, 81. Each was told that they were not under arrest and that they were free to leave at any time.

20. The Tedescos were not given *Miranda* warnings by the troopers.

21. John Tedesco was interviewed in an interview room with a two way mirror. NT 41. Tina Tedesco was interviewed in a sergeant's office. NT 40.

22. The doors of the interview rooms were closed but not locked. NT 40.

23. At no time did either of the Tedescos ask to speak to an attorney or refuse to answer any questions. NT 43, 61.

24. John Tedesco signed a "Noncustodial Written Statement" form at the start of his interview. *Com. Exhibit 6,* NT 58, 68. The form contained language stating that Mr. Tedesco was not in custody and the interview was being voluntarily given. NT 59.

25. John Tedesco left the interview room two times to use the public bathroom in the lobby. No one accompanied him to the bathroom. NT 44,45. He voluntarily returned to the interview room to speak with the troopers.

5

26. Following his interview, John Tedesco gave the police a written statement which he signed at 20:45.

27. Trooper Bonin and Trooper De La Iglesia interviewed Tina Tedesco. The interview lasted one hour and 26 minutes.

28. At the time the interview of Tina Tedesco was taken, she was repeatedly advised that she was not under arrest and that she was free to leave. The troopers explained that the door to the interview room would be closed because it was a busy office, but that she could leave the room at any time by walking out. NT 25.

29. The state police considered the Tedescos to be suspects in the crime of neglect of Barbara Rabins, a care-dependent person, at the time of they were questioned. NT 30, 38.

30. After her interview was completed, Tina Tedesco went out to the parking lot where she waited in her car for her husband. Troopers Bonin and Finn went to her vehicle at the completion of John Tedesco's questioning to ask Tina Tedesco to come in and answer additional questions. She came back into the station and submitted to a second interview. NT 32, 86. This second interview lasted about ten minutes. Id.

31. After their interviews were over, the Tedescos left the barracks at approximately 22:00. NT 24, 26.

32. The state police searched an apartment on old Route 115 in Saylorsburg on October 3, 2011. During the search, the police found a lease agreement for the apartment in the names of Tom Miller/Barbara Robins dated February 1, 2008. The application for the lease appeared to have been completed by John Tedesco and

6

named Tom Miller as his uncle and Barbara Rabins as his aunt. *Com. Exhibit 51, Preliminary hearing.*

33. The apartment was in a filthy condition. There were wheelchairs, walkers and a blanket and couch upholstery in a soiled condition. *Com. Exhibit 44, 46, 50.*

34. The District Attorney's office sought and obtained court orders dated September 13, 2011, for Barbara Rabins' medical records from Pocono Medical Center; October 18, 2011 for her patient records from Somerset Valley Rehabilitation and Nursing Facility; and October 18, 2011 for her patient records from Forest Manor Health Care Center. *Com. Exhibits 53-57, Preliminary hearing.*

35. The Monroe County Coroner's Office issued a death certificate for Barbara Rabins on April 18, 2012 identifying the manner of death as homicide and the immediate cause of death as "Hypernatremic Dehydration with Aspiration of Food Bolus." *Com. Exhibit 25, Preliminary hearing.*

36. Tina Tedesco's counsel submitted evidence of media coverage of the Tedesco's arrest and prosecution.

37. Articles discussing the Tedescos' arrest appeared in the Pocono Record dated July 10, 2013, July 11, 2013, July 12, 2013 after their arrest; September 20, 2013 after their preliminary hearing; and February 4, 2014 when they were scheduled for trial. There was area television coverage of the Tedescos' case on WNEP on July 10, 2013 and September 19, 2013. WFMZ carried a report on July 10, 2013. *Defendant's Exhibit 1.*

7

# DISCUSSION

Tina Tedesco has raised five challenges to the Commonwealth's prosecution. She contends that 1) charges should be dismissed due to prosecutorial delay; 2) she is entitled to a change of venue for purposes of trial due to pre-trial publicity; 3) her statements given to the Pennsylvania State Police on August 24, 2011 should be suppressed; 4) charges should be dismissed for lack of a prima facie case; and 5) her trial should be severed from that of her husband.

## I. Request for Dismissal Due to Prosecutorial Delay

Ms. Tedesco first argues that she is entitled to dismissal due to prosecutorial delay. She contends that the police waited too long to charge her. Barbara Rabins was pronounced dead on August 18, 2011; the police searched the Tedesco home and interviewed John and Tina Tedesco on August 24, 2011. Ms. Tedesco was not charged and arrested for third degree murder and other related charges until July 9, 2013.

Ms. Tedesco makes no claim that the statutes of limitations on these prosecutions had expired. They had not.[1] Tina Tedesco's claim rests instead on the Due Process Clause of the United States and Pennsylvania Constitutions. "The constitutional right to due process also protects defendants from having to defend stale charges, and criminal charges should be dismissed if improper pre-arrest delay causes prejudice to the defendant's right to a fair trial." *Commonwealth v. Snyder*, 713 A.2d

---

[1] A prosecution for murder or conspiracy to commit murder may be commenced at any time. 42 Pa.C.S.A. §5551. A prosecution for neglect of a care-dependent person, 18 Pa.C.S.A. §2713(a)(1), theft by unlawful taking, 18 Pa.C.S.A. §3921(a) and theft by failure to make required disposition of funds, 18 Pa.C.S.A. §3927(a) must be commenced within five years of the commission of the offense. 42 Pa.C.S.A. §5552 (B)(1). A prosecution for tampering with evidence, 18 Pa.C.S.A. §4910 (1) must be commenced within two years after it is committed. 42 Pa.C.S.A. §5552(a).

8

596, 599-600 (Pa. 1998). Our appellate courts have however affirmed convictions in numerous cases in which defendants were arrested and convicted of homicide charges many years after the commission of a crime due to lengthy investigations and/or recently discovered evidence. *See Commonwealth v. Clayton*, 516 Pa. 263, 532 A.2d 385 (1987) (four years); *Commonwealth v. Sneed*, 514 Pa. 597, 526 A.2d 749 (1987) (more than three years); *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811 (1985), cert. denied, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986) (more than three years); *Commonwealth v. Daniels*, 480 Pa. 340, 390 A.2d 172 (1978) (six years and nine months); *Commonwealth v. Crawford*, 468 Pa. 565, 364 A.2d 660 (1976) (almost four years); *Commonwealth v. Rico*, 443 Pa.Super. 507, 662 A.2d 1076 (1995) (more than seven years); *Commonwealth v. McCauley*, 403 Pa.Super. 262, 588 A.2d 941 (1991) (twelve years); *Commonwealth v. Akers*, 392 Pa.Super. 170, 572 A.2d 746 (1990) (thirteen years); *Commonwealth v. Patterson*, 392 Pa.Super. 331, 572 A.2d 1258 (1990) (twenty-two years); *Commonwealth v. Grazier*, 391 Pa.Super. 202, 570 A.2d 1054 (1990) (six years and nine months); *Commonwealth v. Arnold*, 331 Pa.Super. 345, 480 A.2d 1066 (1984) (fifteen months). *Commonwealth v. Scher*, 803 A.2d 1204 (Pa. 2002) (twenty years).

The parties both cite the case of *Commonwealth v. Scher*, 803 A.2d 1204 (Pa.2002) (Opinion Announcing the Judgment of the Court), cert. denied, 538 U.S. 908, 123 S.Ct. 1488, 155 L.Ed.2d 228 (2003), for the due process standard to be applied when there has been a significant period of delay between a crime and the prosecution

9

of that crime. However, *Scher* was a plurality decision, which does not have precedential value. *Commonwealth v. Wright* 865 A.2d 894, 900 -901 (Pa.Super.2004).

The Pennsylvania Supreme Court held in *Commonwealth v. Snyder*, 713 A.2d 596 (Pa. 1998), that pre-arrest delay constitutes a due process violation where there has occurred "actual prejudice to the defendant" and there existed "no proper reasons for postponing the defendant's arrest." Id. at 605. The Pennsylvania Superior Court thereafter stated that "even in the face of prejudice, delay is excusable if it is a derivation of reasonable investigation." *Commonwealth v. Snyder*, 761 A.2d 584, 587 (Pa.Super.2000) (en banc), appeal denied, 572 Pa. 703, 813 A.2d 841 (2002), citing *Commonwealth v. Sneed*, 526 A.2d 749 (Pa.1987). Thus, it is clear that any inquiry into pre-arrest delay must be directed to both the existence of prejudice to the defendant and to the cause of the delay. *Commonwealth v. Wright,* 865 A.2d 894, 901 (Pa.Super.2004).

There is a shifting burden in extended pre-arrest delay cases with the initial burden upon the accused to establish that the pre-arrest delay caused actual prejudice, and the subsequent burden upon the Commonwealth to provide a reasonable basis for the extended delay in prosecuting the crime. *See: United States v. Sowa*, 34 F.3d 447 (7th Cir.1994), cert. denied, 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995); *Howell v. Barker*, 904 F.2d 889 (4th Cir.1990), cert. denied, 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 595 (1990). *Commonwealth v. Wright*, supra at 902.

Barbara Rabins was pronounced dead on August 18, 2011. The state police searched the Tedesco home on August 24, 2011; that evening they took extensive

10

statements from the Tedescos at the state police barracks. The District Attorney's office obtained a court order on September 13, 2011 for Barbara Rabins' medical records from Pocono Medical Center; police searched the apartment rented by John Tedesco in Barbara Rabins and Tom Millers' names on Route 115 on October 3, 2011. A court order was obtained on October 18, 2011 for Barbara Rabins' patient records from Somerset Valley Rehabilitation and Nursing Facility; and October 18, 2011 for her patient records from Forest Manor Health Care Center. The Coroner filed a death certificate stating that the cause of death was homicide on April 18, 2012. The Commonwealth thereafter presented a case against the Tedescos to the grand jury and obtained statements from the Tedescos' children. *Commonwealth's brief.*

Ms. Tedesco presented no evidence of actual prejudice during the hearing, but argues in her brief that Ronnie Mendel, Barbara Rabins' sister, is very ill.[2] She contends that Ms. Mendel would have been able to testify that she was estranged from Barbara Rabins through no fault of the Tedescos. She also could have described the Barbara Rabins trust agreement. She also contends that she has been prejudiced because Tom Miller, the man who may have shared the apartment on Route 115 with Barbara Rabins is now ill and in a Veteran's Hospital in Luzerne County. It is alleged that he can no longer recall facts regarding Barbara Rabins or his/their dealings with John Tedesco.

When a defendant claims prejudice through the absence of witnesses, there must be a showing of how the missing witness would have aided the defense. *U.S. v. Trammell,* 133 F.3d 1343, 1351 (10th Cir. 1998). Furthermore, it is the defendant's

---

[2] The Commonwealth states in its brief that Ronnie Mendel is deceased.

11

burden to show that the unavailable testimony may not be proven through other means. *U.S. v. Rogers,* 118 F.3d 466, 475 (6th Cir. 1997).

The Commonwealth responds to this argument by noting that Tom Miller was not living with Barbara Rabins at the time of her death; he was already in the Veterans Hospital, and could not recall the details of his contacts with Barbara Rabins and John Tedesco at that time. Ronnie Mendel was estranged from her sister and it is not clear how her testimony could have been of benefit to the defense. The Commonwealth alleges that her husband, Dr. Stanley Mendel, is living and is available for trial. The trust that was paying Barbara Rabins expenses was managed by a bank, so the trust agreement and the details of trust management are available to the defense. I find that the defendants have not shown actual prejudice resulting in the delay in the prosecution.

Likewise, I find that the Commonwealth had a reasonable basis in continuing to investigate the circumstances of Barbara Rabins' death and that part of the delay after the gathering of Barbara Rabins' medical records was caused by the use of the grand jury to pursue the investigation. The motion will be denied.

## II. Defendant's Request for Change of Venue

Tina Tedesco presented articles of media coverage from the Pocono Record, dated July 10, 2013, July 11, 2013, July 12, 2013, September 20, 2013 and February 4, 2014; PoconoNews.Net, dated September 20, 2013, the Times News Online dated July 11, 2013; LehighValleyLive.com, dated July 10, 2013; and the Morning Call dated July 10, 2013. Story copy was presented from WNEP dated July 10, 2013 and September

12

19, 2013; from 69 News dated July 10, 2013. *Defendant's Exhibit 1.* Ms. Tedesco argues that there has been an "overwhelming amount of adverse and inflammatory pretrial publicity by media serving Monroe County, Pennsylvania." *Defendant's brief.*

The question presented by a motion for change of venue is whether it is possible to obtain jurors who have not formed fixed opinions of the defendant's guilt or innocence as a result of the pre-trial publicity. *Commonwealth v. Bachert,* 453 A.2d 931 (Pa.1982). Pre-trial publicity will be deemed inherently prejudicial where the publicity is sensational, inflammatory, slanted towards conviction rather than factual and objective; revealed that the accused had a criminal record; referred to confessions, admissions or re-enactments of the crime by the accused; or derived from reports from the police and prosecuting officers. *Commonwealth v. Pursell,* 495 A.2d 183 (Pa.1985). However, even if one of these elements exists, a change of venue will not be required where there has been sufficient time between publication and trial for the prejudice to dissipate. *Commonwealth v. Casper,* 392 A.2d 287 (Pa.1978), *Commonwealth v. Gorby,* 588 A.2d at 902,906 (Pa.1991).

A review of the news reports indicates that they were based upon reports of the police, prosecuting officers, admissions of the defendants and testimony at the preliminary hearing. However, significant time has passed since this coverage took place. The articles and coverage appeared at the time of the Tedescos' arrest and their preliminary hearing in September, 2013. Since that time there has only been one article in the Pocono Record in February, 2014 when the case was listed for trial.

13

"[T]he pivotal question in determining whether an impartial jury may be selected is not whether prospective jurors have knowledge of the crime being tried, or have even formed an initial opinion based on the news coverage they had been exposed to, but, rather, whether it is possible for those jurors to set aside their impressions or preliminary opinions and render a verdict solely based on the evidence presented to them at trial." *Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 314 (2011).

Ms. Tedesco will be given the opportunity of individual voir dire at the time of jury selection. A determination can be made at that time whether it is possible to obtain an impartial jury. The motion will be denied, with the right to renew the motion if necessary during jury selection.

### III. Tina Tedesco's Statements to the State Police on August 24, 2011

Tina Tedesco has requested the court to suppress the statements she made to the police on August 24, 2011. She was questioned three times; once when her home was being searched and twice after she went to the State Police barracks on the night of August 24, 2011. No *Miranda* warnings were given to her before she was questioned.

*Miranda* rights are required only prior to a custodial interrogation. *Commonwealth v. Housman*, 986 A.2d 822, 839 (Pa.2009), cert. denied, —— U.S. ——, 131 S.Ct. 199, 178 L.Ed.2d 120 (2010). "Custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [his] freedom of action in any significant way.' " *Commonwealth v. Gonzalez*, 979 A.2d 879, 887–88 (Pa.Super.2009), quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Volunteered statements by an individual are

14

admissible without the administration of Miranda warnings. Id. *See also, Commonwealth v. Cornelius,* 856 A.2d 62, 75 (Pa.Super.2004), appeal denied, 586 Pa. 755, 895 A.2d 548 (2006). *Commonwealth v. Garvin* 50 A.3d 694, 698 (Pa.Super.2012). "The test for determining whether a suspect is in custody is whether the suspect is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted." *Commonwealth v. Eichinger,* 591 Pa. 1, 915 A.2d 1122, 1134 (2007); *Commonwealth v. McCarthy,* 820 A.2d 757, 759–760 (Pa.Super.2003). This standard is an objective one, which takes into consideration the reasonable impressions of the person being interrogated. *McCarthy,* 820 A.2d at 759-760 (citations omitted). The test "does not depend upon the subjective intent of the law enforcement officer interrogator," but instead "focuses on whether the individual being interrogated reasonably believes his freedom of choice is being restricted." *Commonwealth v. Hayes,* 755 A.2d 27, 33–34 (Pa.Super.2000), *quoting Commonwealth v. Gibson,* 720 A.2d 473, 480 (Pa.1998). The fact that the police may have "focused" on the individual being questioned or that the interviewer believes the interviewee is a suspect is irrelevant to the issue of custody. *Commonwealth v. Smith,* 575 Pa. 203, 836 A.2d 5, 18 (2003). "A person is considered to be in custody for the purposes of Miranda when the officer's show of authority leads the person to believe that she was not free to decline the officer's request, or otherwise terminate the encounter. *Hayes,* 755 A.2d at 33–34." *Commonwealth v. Page* 965 A.2d 1212, 1217 -1218 (Pa.Super.2009).

15

Tina Tedesco was questioned by the police three times on August 24, 2011. The first occasion was in her home when the state police came to execute the search warrant. Corporal William Gross of the Pennsylvania State Police oversaw the search of the Tedesco home. When the police arrived to conduct the search, Tina Tedesco was home with her daughter. Corporal Gross "escorted them to the kitchen area and Mrs. Tedesco and her daughter and (Corporal Gross) remained in the kitchen for the entire time the search warrant was being conducted." NT 49. The search took approximately 30 minutes. Id. Ms. Tedesco was told the purpose of the search was to investigate questions raised by the coroner about the death of Barbara Rabins. NT 77. While Ms. Tedesco was in the kitchen with Corporal Gross, he asked her about her relationship with Barbara Rabins and where Ms. Rabins lived. Id.

Although Tina Tedesco's freedom of movement was restricted during the search, these questions about the background of where Barbara Rabins lived and who took care of her in the Tedesco home did not amount to a custodial interrogation. Specifically excluded from custodial interrogation (in the *Miranda* decision) was '(g)eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process ...' *Miranda, supra,* 86 S.Ct. at 1629. This type of questioning was excluded since '(i)n such situations the compelling atmosphere inherent in the process of in custody interrogation is not necessarily present.' Id. at 478, 86 S.Ct. at 1630. (Footnote omitted.) As relates to questioning during the execution of a search warrant, no Pennsylvania appellate case has been found but another appellate court has stated:

16

> (w)e do not think that the fact that a person is present and is requested to be seated during the execution of a search warrant in itself creates custody. . . . (Wells v. United States, D.C.App., 281 A.2d 226, 228 (1971).)

*Tyler v. U. S.* 298 A.2d 224, 226 (D.C. 1972).

Here Corporal Gross's questions appear to be the general fact-gathering questioning excluded from the Miranda holding. The Tedescos had already told the deputy coroner that Barbara Rabins lived there. Trooper Gross asked Tina Tedesco where she stayed in the house and how the Tedescos had come to care for her. Viewing the relevant factors surrounding the interview, I find that there was no custodial interrogation in the house of the kind addressed in *Miranda*, and therefore the request to suppress the statements will be denied.

Ms. Tedesco also seeks to suppress her statements to the police at the barracks. The state police asked the Tedescos to come to the barracks to answer questions as the police were leaving the Tedesco home. The decision to go to the barracks and give a statement was left up to the Tedescos. The Tedescos chose to go to the barracks to answer the troopers' questions. After having reviewed the audiotapes of the two interviews of Tina Tedesco, I find that the police did subject her to interrogation, but that it was not a custodial interrogation, and therefore *Miranda* warnings were not required.

Ms. Tedesco signed in to the barracks as a visitor; she was advised that she was not under arrest and was free to leave. She repeatedly acknowledged that she understood this. Although she was questioned in a closed room, the door was not locked and she was not restrained in any way. The police exhibited no force toward her.

17

When the police finished questioning her, she left the barracks and waited for her husband in the parking lot.

The police later came out to her car and asked her to return for additional questions after they concluded questioning John Tedesco. She again agreed to come into the barracks. This questioning lasted ten minutes. She acknowledged that she understood she was free to leave during the questioning.

These statements were not made while Tina Tedesco was in custody and will not be suppressed.

## IV. Motion to Dismiss

Ms. Tedesco seeks the dismissal of all charges, contending that the Commonwealth has not established a prima facie case in any of them. A prima facie case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime. *Commonwealth v. Miller*, 810 A.2d 178, 181 (Pa.Super.2002). In determining the presence or absence of a prima facie case, inferences reasonably drawn from the evidence of record that would support a verdict of guilty are to be given effect, but suspicion and conjecture are not evidence and are unacceptable as such. Id. A prima facie case in support of an accused's guilt consists of evidence that, if accepted as true, would warrant submission of the case to a jury. *Commonwealth v. Packard*, 767 A.2d 1068, 1070-71 (Pa.Super.2001), appeal denied, 566 Pa. 660, 782 A.2d 544 (2001). The evidence must demonstrate the existence of

18

each of the material elements of the crime charged. *Commonwealth v. Wojdak*, 466 A.2d 991 (Pa. 1983).

*Third Degree Murder*

The Pennsylvania Crimes Code provides:

**§ 2501. Criminal homicide**

**(a) Offense defined.**--A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being.

**(b) Classification.**--Criminal homicide shall be classified as murder, voluntary manslaughter, or involuntary manslaughter

18 Pa.C.S.A. § 2501.

**§ 2502. Murder**

**...(c) Murder of the third degree.**--All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

18 Pa.C.S.A. § 2502.

To convict a defendant of the offense of third degree murder, the Commonwealth must prove that the defendant killed another person with malice aforethought. The Pennsylvania Supreme Court has often held that malice comprehends not only a particular ill-will, but also a wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty. *Commonwealth v. Santos*, 583 Pa. 96, 876 A.2d 360, 363 (Pa. 2005). *See also Commonwealth v. Drum*, 58 Pa. 9, 15 (Pa. 1868) (defining malice as quoted above). The supreme court has further noted:

> [T]hird degree murder is not a homicide that the Commonwealth must prove was committed with malice and without a specific intent to kill. Instead, it is a homicide that the Commonwealth must prove was committed with malice, but one with respect to which the Commonwealth need not prove, nor even address, the presence or absence of a specific intent to kill. Indeed, to convict a defendant for third degree murder, the jury need not consider whether the defendant had a specific intent to kill, nor make any finding with respect thereto. *Commonwealth*

19

*v. Meadows*, 787 A.2d 312, 317 (Pa.2001) (*quoting Commonwealth v. Young*, 748 A.2d 166, 174–75 (Pa.1999)).

*Commonwealth v. Fisher* 80 A.3d 1186, 1191 (Pa. 2013).

The Commonwealth's case against Tina Tedesco is based upon her failure to provide for the basic necessities of life for Barbara Rabins. The Commonwealth contends that the Tedescos were receiving more than $3,000 per month from Barbara Rabins' trust fund to pay for those necessities. The Commonwealth cites *Commonwealth v. Pestinikas*, 617 A.2d 1339 (Pa.Super. 1992) to support its case. The *Pestinikas* court considered facts similar to those presented by the Commonwealth's evidence here. There a paid caregiver for an elderly man failed to provide necessary food, shelter and medical care which eventually resulted in the man's death. The court held that:

> ...when, in 18 Pa.C.S. § 301(b)(2), the statute provides that an omission to do an act can be the basis for criminal liability if a duty to perform the omitted act has been imposed by law, the legislature intended to distinguish between a legal duty to act and merely a moral duty to act. A duty to act imposed by contract is legally enforceable and, therefore, creates a legal duty. It follows that a failure to perform a duty imposed by contract may be the basis for a charge of criminal homicide if such failure causes the death of another person and all other elements of the offense are present. Because there was evidence in the instant case that Kly's death had been caused by appellants' failure to provide the food and medical care which they had agreed by oral contract to provide for him, their omission to act was sufficient to support a conviction for criminal homicide, and the trial court was correct when it instructed the jury accordingly.

Id. at 1344 – 1345.

The *Pestinikas* court went further in its holding, requiring proof of malice:

> the omission to act will not support a prosecution for homicide in the absence of the necessary mens rea. For murder, there must be malice. Without a malicious intent, an omission to perform duties having their foundation in contract cannot support a conviction for murder. In the instant case, therefore, the jury was required to find that appellants, by virtue of contract, had undertaken

20

responsibility for providing necessary care for Kly to the exclusion of the members of Kly's family. This would impose upon them a legal duty to act to preserve Kly's life. If they maliciously set upon a course of withholding food and medicine and thereby caused Kly's death, appellants could be found guilty of murder.

Id. at 1345.

The Commonwealth's evidence here is that the Tedescos had a legal obligation to provide life-sustaining care to Barbara Rabins. They kept her in isolation from her family members and the public; they received compensation for her care; she had mental and physical disabilities and had sustained a stroke. She was entirely dependent upon the Tedescos for the necessities of life. Since the Tedescos were not using the funds they were receiving to bring in nursing care, that included tending to her incontinence and pressure wounds in addition to providing food, clothing and shelter and necessary medical care. In her weakened and dehydrated condition, it also required much closer supervision than she was being given, including supervision while she ate.

Barbara Rabins cause of death was dehydration and choking on cheese. However, the autopsy report showed a gross neglect of her daily needs, which led to extensive pressure wounds and infections. The evidence also suggests that the Tedescos did not keep her with them in their home, but rather had her alone in a small apartment on Route 115. A jury could find that this combination of neglect and leaving her alone in a greatly weakened, dehydrated condition, unable to care for herself, led to her death.

21

Evidence of malice is also present. A jury could properly find that the Tedescos' neglect of Barbara Rabins and their failure to get her needed nursing and medical care was motivated by greed. The Tedescos had more than sufficient monies from the Rabins' trust fund to provide proper care to Ms. Rabins and still receive adequate compensation. Their appropriation of her funds while they dangerously neglected her constituted "wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty." The Commonwealth has established a prima facie case.

The Commonwealth has also established a prima facie case of conspiracy to commit murder. The essence of criminal conspiracy is the agreement between co-conspirators to aid or commit an unlawful act with shared criminal intent, and an overt act in furtherance of the conspiracy. *Commonwealth v. Rios,* 684 A.2d 1025 (Pa. 1996)

The evidence presented supports a jury finding that the defendants acted in concert in receiving the Rabin trust funds and depriving the decedent of necessary food, nursing and medical care. The Commonwealth does not have to establish that the defendants intended to kill the victim to be convicted of third-degree murder. If they maliciously intended to deprive Barbara Rabins of necessary food, supplies, nursing and medical care for their own financial gain, which led to her death, they can be convicted of conspiracy to murder. *See Commonwealth v. Fisher, supra.* Again, the Commonwealth has established a prima facie case.

22

*Neglect of Care of a Dependent Person*

The Crimes Code provides:

**18 Pa.C.S. § 2713. Neglect of care-dependent person.**

    **(a) Offense defined.--** A caretaker is guilty of neglect of a care-dependent person if he:

(1) Intentionally, knowingly or recklessly causes bodily injury or serious bodily injury by failing to provide treatment, care, goods or services necessary to preserve the health, safety or welfare of a care-dependent person for whom he is responsible to provide care.

18 Pa.C.S.A. § 2713.

Subsection (f) defines "care-dependent person" as "(a)ny adult who, due to physical or cognitive disability or impairment, requires assistance to meet his needs for food, shelter, clothing, personal care or health care."

For the reasons cited above, the Commonwealth has produced sufficient evidence of Tina Tedesco's violation of this statute for the case to go to the jury.

*The Theft Offenses*

The offense of Theft by Unlawful Taking—Movable Property is defined at section 3921 of the Crimes Code as follows: "A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa. Cons.Stat.Ann. § 3921(a). A challenge to a prima facie case of theft was considered in the case of *Commonwealth v. McCullough*, 86 A.3d 896 (Pa. Super. 2014). There the defendant provided caregiver services to a person using a power of attorney at a rate which the Commonwealth alleged was exorbitant, and used the

23

money to pay his own debts. The superior court held that under these facts a prima facie case of theft was established:

> we find this sufficient so that a jury could reasonably infer from the circumstances that McCullough intended to deprive the victim of her money in order to pay off her outstanding invoices.

Id. at 899.

Based upon the holding in *McCullough*, the Commonwealth has established a prima facie case of theft of Barbara Rabins' funds by Tina Tedesco, who allegedly used the Rabin trust funds for her own purposes rather than the nursing and medical care of Barbara Rabins. For the same reasons, the Commonwealth has established a prima facie case of Count 5, Theft by Failure to Make Requisite Disposition of Funds.

*Tampering with Evidence*

The Crimes Code provides:

### § 4910. Tampering with or fabricating physical evidence

A person commits a misdemeanor of the second degree if, believing that an official proceeding or investigation is pending or about to be instituted, he:

(1) alters, destroys, conceals or removes any record, document or thing with intent to impair its verity or availability in such proceeding or investigation;

18 Pa.C.S.A. § 4910.

Here the Commonwealth alleges that the Tedescos destroyed evidence of Barbara Rabins' care at their residence and moved the decedent's body from the apartment on Route 115 to their home in an attempt to trick the authorities into believing that Barbara Rabins was being cared for and died in their residence.

To establish the offense of tampering with evidence, the Commonwealth must prove three interrelated elements: (1) the defendant knew that an official proceeding or

24

investigation was pending [or about to be instituted]; (2) the defendant altered, destroyed, concealed, or removed an item; and (3) the defendant did so with the intent to impair the verity or availability of the item to the proceeding or investigation. *Commonwealth v. Jones*, 904 A.2d 24, 26 (Pa.Super.2006), appeal denied, 591 Pa. 690, 917 A.2d 845 (2006) (*citing Commonwealth v. Morales*, 447 Pa.Super. 491, 669 A.2d 1003, 1005 (1996)) (citing 18 Pa.C.S.A. § 4910(1)). *Commonwealth v. Yasipour*, 957 A.2d 734, 745 (Pa.Super.2008).

The Commonwealth has met its burden of a prima facie case.

## V. *Motion for Severance*

Tina Tedesco seeks a severance of her trial from John Tedesco's trial. She argues that she will be prejudiced by a joint trial because of the introduction of her husband's statements to police which implicate her. The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted by witnesses against him...." U.S. Const. amend. VI. In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the U.S. Supreme Court held that a defendant "is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh,* 481 U.S. 200, 201–202, 107 S.Ct. 1702, 1704, 95 L.Ed.2d 176 (1987) (summarizing holding of Bruton ). However, the *Bruton* holding was limited in later decisions. In *Richardson,* the Supreme Court held that the "Confrontation Clause is not

25

violated by the admission of a non-testifying co-defendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson*, 481 U.S. at 211, 107 S.Ct. 1702.

The Pennsylvania Supreme Court has held that substituting the neutral phrase "the guy" or "the other guy" for the defendant's name is an appropriate redaction. *See Commonwealth v. Travers*, 564 Pa. 362, 768 A.2d 845, 851 (2001).

Pennsylvania appellate decisions have also distinguished a codefendant's confession that "expressly implicates" the accused from one that is inculpatory only when linked with evidence properly introduced at trial. *Richardson*, 481 U.S. at 208, 107 S.Ct. at 1707. Accordingly, in *Richardson*, the U.S. Supreme Court declined to extend its holding in *Bruton* to a co-defendant's confession that was redacted to omit any reference to the defendant, but could be linked to the defendant by inferential incrimination. Id. at 211, 107 S.Ct. at 1709. "Likewise, our state Supreme Court has upheld this distinction as it emphasized there is no *Bruton* violation when the accused is linked to the crime with other properly admitted evidence other than the redacted confession; it is "a permissible instance of contextual implication." *Commonwealth v. Cannon*, 22 A.3d 210, 219 (Pa. 2011); *Commonwealth v. James* 66 A.3d 771, 777 (Pa.Super.2013).

The Commonwealth points out that most of John Tedesco's references to Tina Tedesco are indirect, such as "we did the best we could." I agree that such statements do not run afoul of *Bruton* because they do not directly reference Tina Tedesco. The

26

Commonwealth suggests that where John directly implicates Tina, a redaction will be made to substitute "the other person" for Tina's name. The defendants' statements are audiotaped, so it remains to be seen how they will be presented to the jury; if redaction of an express reference to the other defendant is not possible, the evidence will not be allowed.

The other reason Tina Tedesco requests severance is because she wishes to invoke the spousal privilege found at 42 Pa.C.S.A. §5913. That statute provides as follows:

### § 5913. Spouses as witnesses against each other

Except as otherwise provided in this subchapter, in a criminal proceeding a person shall have the privilege, which he or she may waive, not to testify against his or her then lawful spouse except that there shall be no such privilege:

(1) in proceedings for desertion and maintenance;

(2) in any criminal proceeding against either for bodily injury or violence attempted, done or threatened upon the other, or upon the minor children of said husband and wife, or the minor children of either of them, or any minor child in their care or custody, or in the care or custody of either of them;

(3) applicable to proof of the fact of marriage, in support of a criminal charge of bigamy alleged to have been committed by or with the other; or

(4) in any criminal proceeding in which one of the charges pending against the defendant includes murder, involuntary deviate sexual intercourse or rape.

42 Pa.C.S.A. § 5913.

The fourth exception above addresses this case, where there is a murder charge. Accordingly, the right to refuse to testify against her husband is not available to Ms. Tedesco.

27

The Pennsylvania Supreme Court addressed the status of spousal privilege after the enactment of the current law in 1989:

> To paraphrase the rules with regard to spousal testimony, a husband or wife is now deemed competent to testify against his or her spouse, but has a privilege to refuse to give adverse testimony, which he or she may waive. There is no privilege to refuse to testify against a spouse in four distinct situations: (1) actions for desertion and maintenance; (2) cases where the one spouse is charged with threatening, attempting, or committing acts of bodily injury or violence against the other or against any child in their care; (3) cases of bigamy; or (4) cases where one of the charges is murder, rape, or involuntary deviate sexual intercourse. Even if a husband or wife may be called to give testimony adverse to his or her spouse, however, he or she is not competent to testify to confidential communications. Nevertheless, should the defense attack a spouse's character or conduct, the attacked spouse is a competent witness and may testify even to confidential communications.

*Commonwealth v. Newman*, 633 A.2d 1069, 1072 (Pa. 1993).

Tina Tedesco has a Fifth Amendment right not to testify in the trial. She does not have the right to exercise a spousal privilege not to testify against her husband because of the murder exception to the statute. Should John Tedesco choose to testify in the trial, she would be entitled to assert the bar to confidential communications between spouses found in 42 Pa.C.S.A. §5914. *But see Commonwealth v. Hunter*, 60 A.3d 156 (Pa.Super. 2013) (where a defendant-spouse is the alleged perpetrator in current child abuse proceedings and where that abuse forms the basis of criminal proceedings against that defendant-spouse, the section 5914 privilege shall not apply at the defendant's criminal trial to preclude admission of spousal communications).

Tina Tedesco's Omnibus Pretrial Motion also included a request to exclude autopsy photographs at trial. However, she has not briefed this issue. I will address this motion as a motion in limine and will rule on any objections at time of trial.

28

She has also requested an appointment of an independent forensic examiner but has not briefed that either. If she wishes to pursue this relief, that should be done by motion.

Finally, she has requested an order preventing spoliation of evidence. This has been addressed by an order issued at the time of the hearing.

## COURT OF COMMON PLEAS OF MONROE COUNTY
## FORTY-THIRD JUDICIAL DISTRICT
## COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, : No. 2229 CR 2013

               vs.             :

TINA TEDESCO,            :

      Defendant       :

## ORDER

**AND NOW**, this 20th day of June, 2014, after consideration of Defendant Tina Tedesco's Omnibus Pretrial Motion, and the parties' briefs, **IT IS ORDERED** as follows:

1. The motion is **denied** in all respects.

2. A status conference shall be held on June 30, 2014 at 2:00 o'clock p.m. in Courtroom No. 5, Monroe County Courthouse, Stroudsburg, Pennsylvania.

                    **BY THE COURT:**

                    _____
                    ARTHUR L. ZULICK, J.

cc:    Michael Mancuso, Esquire, First Assistant D.A.
       Robin Spishock, Esquire, Public Defender
       Brian Gaglione, Esquire

ALZ2014-027

30

## COURT OF COMMON PLEAS OF MONROE COUNTY
## 43RD JUDICIAL DISTRICT
## COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA          2229 CR 2013
      Vs
TINA TEDESCO

### OPINION& ORDER

**Micael Mancuso,  Esq  ADA**      _Shy Roe_        Date 6/20/14

**Brian Gaglione, Esquire**     _L. Van't Hoogt_      Date: 6/23/14

**Robin Spishock, Esq, PD**     _Karen Smith_      Date: 6/23/14


**I, Mindy Ditmars, depose the said attached Opinion/Order in the above mentioned manner on June 20, 2014.**

_Mindy Ditmars_

**Mindy Ditmars, Clerk**